**In re A. C. BECKEN CO.**

**MORRIS et al. v. HUMMEL.**
No. 5307.

Circuit Court of Appeals, Seventh Circuit.
Feb. 12, 1935.

Rehearing Denied April 2, 1935.

Beverly B. Vedder, Allan J. Carter, T. C. Strachan, Jr., and Herbert Pope, all of Chicago, Ill., for appellants.

Ralph F. Potter, William H. King, Jr., and William R. Rodenberg, all of Chicago, Ill., for appellee.

Before EVANS, SPARKS, and FITZ HENRY, Circuit Judges.

SPARKS, Circuit Judge.

This appeal is from an order of the District Court affirming an order of the referee, which disallowed appellants' claims filed in the bankruptcy proceeding, and denying a petition to review the referee's order.

The claims arose out of the sale of appellants' stock in Otto Young & Company to A. C. Becken, Jr., the president of the bankrupt, A. C. Becken Company, and the acquisition of the assets of the Young Company by the bankrupt. Peter T. White filed a similar claim, and by stipulation it will be governed by the outcome of this appeal.

The main question involved is whether appellants are entitled to share in the bankrupt's estate for the unpaid balance of the purchase price of the Young Company stock sold to A. C. Becken, evidenced by his unendorsed notes, which were secured by preferred stock of the bankrupt and other collateral.

Prior to the transactions out of which these claims arose, the Young and Becken companies were old and successful wholesale jewelry houses located in Chicago. The Young Company was under the management of Peter T. White who owned fifteen per cent of its capital stock, the remainder being owned equally by appellants, who are sisters. The Becken Company was controlled by Becken who with his mother and sister owned ninety-four per cent of its stock, the remainder being owned by that company's employees.

In December, 1928, Arthur W. Reebie (husband of appellant Reebie) and E. J. Lehman, representing appellants, together with White, suggested to Becken that the bankrupt purchase the assets of Otto Young & Company. Becken replied that the bankrupt had already agreed to purchase the assets of another company, and hence could not assume the liabilities necessary in taking over the Young Company without adversely affecting bankrupt's balance sheet. He suggested, however, that he personally would assume such liabilities. Subsequent meetings of the parties' representatives were had, and the record discloses no disagreement as to the value of the Young Company assets. Young & Company was willing to sell its capital stock at its book value, plus $75,000, and Becken and the Becken Company were willing to pay that price. In fact, they agreed to abide by the determination of the book value by Arthur Andersen and Company, Certified Public Accountants. All the parties understood that the Becken Company desired to take over the assets of Young & Company, and that if the sale should be made to Becken personally, he would be making the purchase for and on behalf of the Becken Company, and would contemporaneously therewith turn the property over to the Becken Company. As a preliminary to the signing of the agreement, it was stated by the Becken Company in the presence of all the interested parties, including appellants' representative, Mr. Reebie, and their attorney, that the final agreement must be in such terms that a certified accountant would agree that the price to be paid was not a direct or contingent liability of the Becken Company, as that company had always issued statements to trade agencies, and if such statements to be issued carried such a liability, the company's capital rating and standing would be materially affected. It was agreed by all parties that the wishes of the Becken Company should be complied with in that re-

spect, as they did not wish anything to appear in the statements issued by that company which might have a bad effect upon its credit rating. How to accomplish this result was the question which delayed the consummation of the deal, and they finally adopted the procedure of selling the Young Company properties to Becken personally.

The first written agreement was executed on January 23, 1929. The parties to it were appellants, White, the Becken Company, and Becken. The material provisions of this contract were:

First, it was agreed that Becken, individually, should buy all of the capital stock of the Young Company from Morris, Reebie, and White, at a price which was to be the book value as determined by an audit to be made by Arthur Andersen and Company, plus $75,000 for good will. Becken was to make a down payment of $100,000 in cash, and give his personal notes, payable over a period of nine years, for the balance.

Second, Becken was to deposit $400,000 of the preferred stock and $150,000 of the common stock of the Becken Company with an escrow agent or trustee as collateral to secure the payment of his notes. The Becken Company, which had been capitalized at $100,000, was to increase its capital so that it would have $1,000,000 of capital stock issued, outstanding and fully paid, of which $400,000 was to be preferred and $600,000 common stock. In addition to the stock, Becken was to procure and deposit a policy of insurance on his life in the amount of $200,000.

Third, the interest rate on Becken's notes, the dates of their maturity, and Becken's right to anticipate them, were to be so synchronized with the dividend rate, redemption, and retirement provisions of the preferred stock that, while only Becken was to be liable for the purchase price, the dividends on and retirement of the preferred stock collateral were to coincide with the interest and principal payments to be made by Becken on the notes to be given by him.

Fourth, an agreement was to be made by Becken and the Becken Company which would give the noteholders the right to name one of the seven members of the board of directors of the Becken Company, would limit the salaries to be paid, would restrict the amount of dividends to be paid on junior securities, would prohibit the creation of liens against the Becken Company's assets and the assumption of any obligations in excess of $50,000, unless to be repaid within a

year, except with the consent of all of the directors. There were other provisions to insure that the company would be prudently managed and the value of the collateral maintained.

Fifth, the deal was not consummated by the agreement, but was to be completed within five days after delivery to the Becken Company and to Morris, Reebie, and White, of the certificate of Arthur Andersen and Company showing the book value of the Young Company.

Sixth, the escrow agreement provided for the return from time to time to Becken of such amount of the preferred stock as at par equaled the amount of the notes given thereunder when and as the same were paid by Becken. All stock deposited with the escrow agent was to be issued in the name of Becken and endorsed in blank by him. He was to have the right to vote that stock unless default occurred in the payment of the principal or interest on the notes or in any of the agreements; and, until there had been a default by Becken, all dividends on the stock held by the escrow agent should be paid to Becken.

It was subsequently agreed by the parties that the return of stock mentioned in the first clause of the last paragraph referred only to the $400,000 series of notes.

The contract of January 23, 1929, was authorized at a special meeting of bankrupt's board of directors on the same day. That resolution in substance authorized its president and secretary to enter into contracts on behalf of the bankrupt with appellants and White for the purchase of the stock of the Young Company, or its assets, and to become a party to any contracts made by Becken with them for the purchase of the stock or assets of that company, and gave him discretionary power as to the terms of the contract.

On the day before the contract just referred to was signed, Becken arranged with the Union Trust Company for an increase in the bankrupt's line of credit with that bank from $200,000 to $500,000 upon Becken's representation that the contract was substantially as provided in the contract of January 23, and that $400,000 of the purchase price would become a capital stock obligation of the bankrupt. On January 23, the Union Trust Company accordingly loaned bankrupt $175,000, of which $100,000 was used in making the initial cash payment under the contract, of which fact appellants had knowledge. In February, 1929, the Union Trust Company merged with the First National Bank, which retained the $500,000 line of credit as its commitment. Arthur Andersen and Company reported on March 7, 1929, that the net worth of the Young Company was $539,922.92, which with the good will value of $75,000 made the total purchase price $614,922.92.

On March 16, 1929, the transaction set forth in the contract of January 23, was closed, and at the same time two contracts were entered into. The first was a trust agreement signed by appellants, White, Becken, the bankrupt, and the Foreman Trust and Savings Bank as Trustee.

The trust agreement recited that appellants and White had sold and delivered to Becken for the benefit of the bankrupt all of the capital stock of the Young Company for the total purchase price of $614,922.92 and had delivered to Becken the resignation of its officers and directors; that Becken had paid to appellants and White $100,000 in cash and had given his promissory notes dated February 1, 1929, for the balance; that Becken had deposited with the Trustee a $200,000 life insurance policy; that the bankrupt had by due corporate action authorized the execution of the agreement, and that Becken had deposited with the Trustee 4000 shares of preferred stock and 1500 shares of common stock of the bankrupt, all of which were fully paid and non-assessable. These recitals indicated that the agreement was intended to serve as a closing memorandum of the sale as well as a trust agreement. The contract then set forth without change the various provisions contemplated by the contract of January 23, 1929, and in addition specified the rights and duties of the Trustee in the event of default on the part of Becken.

The other contract, entered into on March 16, was between Becken and the bankrupt, and was authorized at a special meeting of the latter's stockholders on February 15. Its purpose was set forth in its preamble:

"Whereas, A. C. Becken, Jr., heretofore entered into a certain agreement with Margaret S. Morris, Kathryn S. Reebie and Peter T. White for the purchase of all of the shares of the capital stock of Otto Young & Co., in which contract A. C. Becken Company also joined; and

"Whereas, said agreement was entered into for the purpose of securing to A. C. Becken Company all of the assets of said Otto Young & Co., and

"Whereas, in order to consummate said agreement, it is provided in said contract that the parties hereto enter into covenants with each other,

"Now, therefore, in consideration of the premises and for the purpose of consummating said agreement, * * *."

The contract then set forth the various agreements between Becken and the bankrupt contained in the contract of January 23, and in addition there was the following paragraph:

"7. A. C. Becken, Jr., upon securing all of the shares of stock of Otto Young & Co., shall cause all of the assets of Otto Young & Co. to be transferred and delivered to A. C. Becken Company in consideration of the payment by said company to him of the sum of * * * $100,000 and the issuance to him of * * * 4,000 shares of the fully paid and non-assessable preferred capital stock of A. C. Becken Company *and the agreement of said company to assume all of his obligations under said contract with said Morris, Reebie and White, and to pay as and when they severally become due all of the notes payable to said Morris, Reebie and White,* more particularly described in said contract and aggregating the sum of * * * $514,922.92. Said A. C. Becken, Jr., shall, in further consideration thereof, also transfer and deliver to A. C. Becken Company, or its nominees, *10 shares of the capital stock of Otto Young & Co., and shall deposit for and on behalf of A. C. Becken Company with the Foreman Trust & Savings Bank as Trustee, under the terms of a certain Indenture between said Morris, Reebie and White, A. C. Becken, Jr., A. C. Becken Company and the Foreman Trust & Savings Bank the said * * * 4,000 shares of the preferred stock of A. C. Becken Company, which he is to receive from the company, and that as and when said notes so deposited with said Foreman Trust & Savings Bank shall be paid by the company said preferred stock shall be surrendered to the Company, and in case the company shall from time to time redeem any or all of said preferred stock, the proceeds of such redemption shall be applied to the payment of said notes." (Our italics.)

All of the capital stock of the Young Company was delivered to Becken who caused that company to transfer its assets to the bankrupt by bill of sale. The bankrupt issued its preferred stock of the par value of $400,000 to Becken, who in turn deposited it under the trust agreement as collateral for his notes executed to appellants and White.

Upon the execution of the contracts on March 16, the certified check of the Becken Company for $100,000, which had been placed in escrow when the preliminary agreement was made, was delivered to claimants, and the balance of the purchase price was evidenced by twenty-seven notes identical except as to names of payees, amounts due, and dates of payment. At the same time, Becken took over 5000 shares of the capital stock of the Young Company, that being the entire amount issued, and cancelled all but ten shares, which with all the assets of the Young Company he transferred to the Becken Company.

The first six instalments of interest on the purchase price indebtedness which became due semi-annually beginning on August 1, 1929, were paid by checks of the Becken Company either directly to appellants or to the Trustee under the trust agreement. The cash payment of $100,000 made March 16, 1929, and the payment of the instalment of principal due February 1, 1930, were also made to appellants by checks of the Becken Company. The instalments of principal due February 1, 1931, and thereafter were not paid and are the basis of the claims in suit.

On March 20, 1931, appellants and White, Becken and the Becken Company, entered into an extension agreement, with the consent of the escrow trustee. That agreement recited that "the Becken Company by action duly taken by its board of directors at a meeting held February 15, 1929, and by contract dated March 16, 1929, between Becken and the Becken Company, assumed all of the obligations of Becken under the 1929 agreement and agreed to pay as and when they severally become due all of the notes payable to Morris, Reebie, and White, and more particularly described in the 1929 agreement * * *." The contract then provided for an extension of a year for the payment of the notes which were due February 1, 1931. All rights of Becken against the Becken Company were assigned to appellants and White, and in the event of a default in payment of principal or interest the holders of the notes were authorized to sue and enforce them in their own names. It was further provided that a majority in amount of said noteholders should have the right to name the auditors who should make an annual examination of the books of the company, but that right was never exercised.

The Becken Company was adjudicated a bankrupt under a voluntary petition on April 28, 1932. Becken was adjudicated a bankrupt on June 29, 1932, and was discharged January 9, 1933.

The referee disallowed the claims on the theory that they arose out of an obligation of a corporation to repurchase its own preferred stock, hence could not be enforced to the prejudice of creditors. This principle is supported quite generally both by the federal and state courts. Keith v. Kilmer (C. C. A.) 261 F. 733, 9 A. L. R. 1287; Boggs v. Fleming (C. C. A.) 66 F.(2d) 859; Olmstead v. Vance & Jones Co., 196 Ill. 236, 63 N. E. 634; Commercial National Bank v. Burch, 141 Ill. 519, 31 N. E. 420, 33 Am. St. Rep. 331; Clapp v. Peterson, 104 Ill. 26.

It is obvious under the facts here presented, and the authorities cited, that the agreement between Becken and the Becken Company, whereby the latter agreed to redeem 4000 shares of the preferred stock which it had delivered to Becken in part payment for the Young Company assets, was one which could not be enforced by Becken to the prejudice of that company's creditors. Neither could such contract be enforced by the Young Company against the Becken Company if they were the only parties to the agreement, or if Becken had assigned such agreement to the Young Company.

Appellants, however, base their right to recover upon that part of the seventh paragraph of the contract between Becken and the Becken Company, in which it was stated that the company agreed to assume all of Becken's obligations under his contract with appellants and White, and to pay when due the notes which Becken had executed to those parties. They urge that this agreement was made for their benefit and may be enforced by them. That such is the general rule can not be controverted. In re Wolf Manufacturing Industries (C. C. A.) 56 F. (2d) 64; Carson Pirie Scott & Co. v. Parrett, 346 Ill. 252, 178 N. E. 498, 501, 81 A. L. R. 1262. However, before such rule can be applicable in a given case, it must appear that the agreement was made for the direct benefit of the third party, and not merely incidentally for his benefit. In the Carson Pirie Scott Case it was said, "If direct, he may sue on the contract; if incidental he has no right of recovery thereon. * * * Each case must depend upon the intention of the parties as that intention is to be gleaned from a consideration of all of the contract and the circumstances surrounding the parties at the time of its execution."

It is clear that Becken's obligations to appellants and White, which it is claimed the Becken Company assumed under paragraph 7, were those obligations set forth in the agreement of January 23, 1929. It is also clear that all parties to all the agreements knew the objects which they mutually sought, and the conditions which confronted them, and they were all aware of the means adopted by which they expected to successfully meet those conditions and accomplish the results desired. The Young Company was anxious to dispose of its business and assets which exceeded $600,000 in value. The Becken Company was anxious to acquire that property, but it could not do so in any manner that would reflect an increase in its liabilities to anything like that extent, because that would seriously affect its commercial rating and standing. It was understood by all the parties that the Becken Company would not enter into any agreement which did not lawfully relieve it from showing in its reports the deferred payment of $400,000 as a current, direct, or contingent liability against its assets, and it was agreeable to all parties that the sale and purchase should be consummated, if possible, in such manner as to comply with the wishes of the Becken Company in that respect. It was under these conditions that the various contracts were entered into and the parties were advised and believed and stated that, so far as the Becken Company was concerned, the transaction with respect to the $400,000 was merely a capital stock transaction which properly should not be reflected in that company's liabilities. That view was confirmed by the subsequent audits which were submitted to appellants, and in which they tacitly acquiesced.

If we should look through the form to the substance of this entire transaction there would be little difficulty in characterizing it as a simple contract of purchase and sale between the two companies, based upon the transfer of 4,000 shares of the capital stock of the Becken Company as a part of the consideration, with an agreement of that company to redeem the stock. But aside from that we think the record discloses no intention on the part of Becken or the Becken Company to render the company liable on Becken's notes under paragraph 7 of their contract of March 16. It will be noted that that section provides that Becken shall cause

the Young Company assets to be transferred to the Becken Company in consideration of the latter's agreement to assume his obligations to pay his notes to appellants. That was not a new promise, for it had already been made substantially, although indirectly, in the agreement of January 23. This fact would tend to show that the agreement referred to in paragraph 7 of the March 16 contract between Becken and the Becken Company was intended as a mere recital of the agreement between the same parties with respect to the same subject matter in the contract of January 23. Of course in the contract of January 23, there was no direct agreement on the part of the Becken Company to assume liability on Becken's notes, but it promised to redeem its preferred stock at times and in amounts which coincided with the due dates and the amounts of the Becken notes. That stock provided for six per cent cumulative dividends which was the precise interest provided for in the notes, and the escrow trustee was obligated to apply the proceeds of the redemptions to the payment of the notes. Hence, while the Becken Company, by the agreement of January 23 and the trust agreement of March 16, did not assume or agree to assume liability on the notes, the performance of its obligations under the contracts would result in the satisfaction of the notes. In that sense, and in no other, had the Becken Company agreed to pay the notes, and under all the circumstances we are convinced that the parties did not intend to enlarge that agreement by paragraph 7 of the contract of March 16, between Becken and the Becken Company. We are driven to this conclusion in order to preserve the presumption of good faith on the part of appellants and White. The record discloses that they, with all other interested parties, intended the transaction to be one that should affect capital only, in order that the obligation should not be shown as a liability against the company. If that were not the intention, there was no apparent necessity for the sale of the Young Company assets first to Becken. It would have been much simpler and just as effective to make the sale direct to the Becken Company. If we accept appellants' construction of paragraph 7 as creating a direct liability upon the Becken Company to pay Becken's notes, it is obvious that the transaction so far as the Becken Company is concerned was not a mere capital transaction, but it involved a current liability which should have been reflected as such in the audits of that company. The audits did not show it as a liability, and of their contents appellants had full knowledge and made no objection thereto. As representative of the noteholders, Arthur Reebie was elected a director of the Becken Company, pursuant to the agreement, on March 16, 1929, and served in that capacity until March 20, 1931. He attended the meetings of the board, and saw the audits and the reports of the company in which appellants' claims were not listed as current liabilities, and he made no objection thereto. Under these circumstances, we think it is clear that there was no intention of the parties that the Becken Company should be liable for the payment of Becken's notes, nor that the promise to pay the notes in paragraph 7 of the contract between the Becken Company and Becken was intended for the benefit of appellants and White.

The extension agreement of March 20, 1931, recited that under paragraph 7 of the March 16 contract of Becken and the Becken Company, the latter was then liable to Becken to pay his notes to appellants as they became due. Then followed the agreement of appellants and White that the time for payment of Becken's notes due February 1, 1931, might be extended by Becken to February 1, 1932. This was followed by Becken's assignment to appellants and White of all his rights in the agreement of the Becken Company to pay as and when they severally became due all the notes, with the further agreement that the noteholders might sue on the Becken Company obligation in paragraph 7, either in their own names or Becken's name. It was further agreed that the obligation of the Becken Company to retire 500 shares of its preferred stock on February 1, 1931, should be extended to February 1, 1932. It is obvious that the extension agreement did not enlarge appellants' rights either by direct promise or by assignment of Becken's rights under paragraph 7, supra, for Becken, as against creditors, had no right to sue on the promise to redeem stock, and he certainly had no right, as against creditors, to sue on a promise of the Becken Company to pay an obligation of his which had been given by him in anticipation of the proceeds of the redemption of the stock. That would be doing indirectly what the law does not permit to be done directly.

■ We are further convinced that the order or decree of the District Court must be affirmed because appellants by their conduct are estopped to assert their claims as against creditors who extended credit relying on the

truth and correctness of the bankrupt's financial statements and reports which did not show the existence of their claim. It will be recalled that these statements and reports which were relied upon by the creditors were made during the time when Mr. Reebie, the representative of appellants and White, was a director of the Becken Company. The record further discloses that the attorneys of appellants and White, by their acquiescence and approval of the plan were equally responsible with the others in the issuance and dissemination of those statements and reports.

The claim of the First National Bank of Chicago was allowed in this proceeding in the sum of $277,524.31, of which $256,024.31 represented unsecured loans to the bankrupt, and the balance, the bankrupt's liability as endorser of discounted paper. Prior to January 23, 1929, upon representations of Becken that $400,000 of the purchase price of the Young Company would 'become a capital stock obligation of the bankrupt, the Union Trust Company had increased the bankrupt's line of credit by $300,000, and this was approved and recognized by the First National Bank after the merger of the two banks. The record discloses that the bank had no notice of appellants' claim until the fall of 1931, and it thereupon notified bankrupt that its unsecured credit could not be continued; that if it had had notice of such claim it would not have extended credit to the bankrupt. In continuing and extending the credit it relied upon the audits which did not show appellants' claims as liabilities. The highest balance of unsecured loans made by the bank to the bankrupt amounted to $500,000 on November 29, 1930. This was steadily decreased from time to time, with two exceptions, until the date of bankruptcy. One exception was when the loan balance was increased $25,000 for seventeen days, and the other exception was when the loan balance was increased $35,000 for four days. Both increases were apparently made temporarily for the purpose of enabling the bankrupt to meet its current obligations, and both were promptly repaid.

The record discloses that four creditors having claims aggregating $72,500, had received and relied upon reports of the bankrupt's financial condition, not disclosing appellants' claims as liabilities, but for which they would have withdrawn the credits extended, or materially reduced them. Forty-seven other creditors having claims aggregating more than $169,000 received either special reports or ratings on the financial condition and credit standing of the bankrupt which they relied on in extending credit to it, and none of those claimants had any knowledge of the bankrupt's obligations to appellants.

As a general rule a creditor is under no duty to keep other creditors of the same debtor informed as to that debtor's indebtedness to him, but he is not permitted to inform others that such debtor is not indebted to him and afterwards deny it to the injury of those so informed. This, we are convinced, is what happened in the instant case, and the decree is

Affirmed.