Jacob **FREIDUS**, Appellant,

v.

**UNITED STATES of America,**
Appellee.

No. 12058.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 1, 1954.

Decided Feb. 24, 1955.

Mr. Thurman Arnold, Washington, D. C., for appellant. Mr. William D. Rogers, Washington, D. C., also entered an appearance for appellant.

Mr. John D. Lane, Asst. U. S. Atty., with whom Messrs. Leo A. Rover, U. S. Atty., Lewis Carroll, William Hitz and Alfred Hantman, Asst. U. S. Attys., were on the brief, for appellee.

Before WILBUR K. MILLER, BAZELON and WASHINGTON, Circuit Judges.

BAZELON, Circuit Judge.

■ Appellant was convicted of submitting a false financial statement to the Reconstruction Finance Corporation in violation of the false statement statute.[1] Chief among many contentions for reversal is that the evidence is insufficient to support the conviction.[2] The test, as stated by this court in Curley v. United States, is whether the evidence is such that "a reasonable mind might fairly conclude guilt beyond reasonable doubt".[3]

The evidence showed that in 1947 appellant and two associates formed a corporation, originally called General Television Corporation, now called Starrett Television Corporation,[4] for the marketing of television sets. Appellant invested the entire capital of $15,000. For this he and his wife received 51 percent of the 200 shares of no-par capital stock then authorized by the corporation's charter and certificate of incorporation; the associates received the rest.

By the end of September 1949, appellant had loaned about $500,000 to the corporation. In order to reduce this indebtedness, the stockholders agreed that as of September 30, 1949, the corporation's charter would be amended to permit issuance of 200 shares of preferred stock in the amount of $339,800 to appellant and his wife, and that the remainder of appellant's loan, $160,000, would be contributed to surplus. On November 1, 1949, the stockholders and directors passed a resolution authorizing amendment of the charter to permit issuance of the preferred stock. The corporation's attorney was instructed to submit a petition so amending the charter to the Division of Corporations in the office of the Secretary of State of New York. Before the charter amendment was approved, however, Starrett's accountant prepared a financial statement, dated "as at September 30, 1949," showing the preferred stock and surplus items in the amounts agreed upon. The State's approval was not received until October or November 1950. The delay resulted from the return of the petition to the corporation's attorney on two separate occasions for correction of technical errors.

Between September 30, 1949, and February 28, 1950, appellant made additional loans to the corporation totalling $270,000. In May 1950, the two minority stockholders transferred their common stock to appellant, and he agreed to donate these additional loans to surplus. A certified public accountant prepared a letter authorizing Starrett's accountant to transfer these loans to the surplus account as of February 28, 1950.

Thereafter, Starrett's accountant prepared the financial statement underlying this prosecution. In August 1950, that statement, dated "as at February 28, 1950," was submitted to the R.F.C. in connection with a bid to purchase certain manufacturing facilities.[5] R.F.C. regarded the statement as not sufficiently recent and, therefore, never actually considered it. No later statement was ever supplied, and for that and other reasons, the purchase was never consummated.

The statement was alleged to be false in reflecting (1) preferred stock of the

1. 18 U.S.C. § 1001 (1952). The indictment was in three counts, but conviction was on count two only. Count one, making substantially the same allegations as count two, was dismissed; and appellant was acquitted on count three, a conspiracy count involving the same transactions as counts one and two. A co-indictee, Knohl, was acquitted on counts two and three.

2. Appellant's motion for acquittal at the close of the Government's case was denied.

3. 81 U.S.App.D.C. 389, 392, 160 F.2d 229, 232, certiorari denied 1947, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850.

4. The original name was changed to Starrett Television Corporation in August 1948.

5. The facilities involved were obtained by R.F.C. when the recipient of an R.F.C. loan defaulted thereon.

value of $339,800, when in fact the corporation's stock consisted solely of common stock; (2) a surplus of $109,400,[6] when in fact the corporation was operating at a deficit; and (3) loans payable of $28,450, when in fact this item amounted to $637,300.

As the Government says, appellant sought "to arrive at a financial statement more palatable to creditors."[7] But that purpose in no way reduces the Government's burden under the false statement statute; it must still prove that the specified entries were objectively false, and were made, willfully and with knowledge of falsity, in a material matter within the jurisdiction of a department or agency of the United States.[8]

We think the proof on (A) materiality of the financial statement, and (B) objective falsity, *scienter*, and criminal intent, was inadequate under the standard of the Curley case, supra, to take the case to the jury.[9] The conviction must therefore be reversed.

*A. Materiality of the financial statement.*

One portion of § 1001 refers to willfully and knowingly falsifying, concealing or covering up "a *material* fact." On the other hand, the part here involved, without expressly mentioning materiality, prohibits "any false, fictitious or fraudulent statements or representations." We think, however, that this highly penal statute must be construed as requiring a material falsification. The legislative purpose strongly implies that only material false statements were contemplated, *i. e.*, statements that could affect or influence the exercise of a governmental function.[10] That purpose, as expressed by the Supreme Court in United States v. Gilliland, was "to protect the authorized functions of governmental departments and agencies from the perversion which might result from the deceptive practices described."[11] No perversion of a governmental function could possibly result from a false statement that was inca-

6. This figure results when appellant's contributions of $160,000 and $270,000 are reduced by the operating deficit of $320,-000 which accrued between September 30, 1949, and February 28, 1950. For convenience, round figures will be used throughout this opinion.

7. Government's brief, p. 6.

8. Section 1001 provides: "Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

9. We do not dispose of appellant's argument that since the R.F.C. was without authority to liquidate collateral, the instant representations were not made in a matter "within the jurisdiction of [a] department or agency of the United States * * *." Appellant relies chiefly on the fact that a clause of § 5 of the original R.F.C. Act, 47 Stat. 6 (1932), as amended, 15 U.S.C.A. § 605, specifi-

cally authorizing the R.F.C. to liquidate security was omitted when, in 1947, the Act was rewritten and revised. 61 Stat. 203 (1947), 15 U.S.C.A. § 604. But we think, without deciding, that since R.F.C. has power to make loans, its power to liquidate assets taken as security is implicit. R.F.C.'s power to sell collateral finds support in the statutory exemption of R.F.C. from sales taxes, 15 U.S.C.A. § 607, and in the provision authorizing the Administrator of the R.F.C. to liquidate its assets upon termination of the lending power conferred by 15 U.S.C.A. § 604. The latter provision appears to be inconsistent with appellant's contention that since 1949 disposal of Government property, including that owned by R.F.C., was in the hands of an Administrator of General Services. (Appellant's brief, pp. 63–64.)

10. That, in essence, is the test of materiality under the perjury statute, 18 U.S.C. § 1621 (1952), to which § 1001 is closely akin. See, e.g., United States v. Hendrickson, 7 Cir., 1952, 200 F.2d 137, certiorari denied 1953, 345 U.S. 926, 73 S. Ct. 785, 97 L.Ed. 1357.

11. 1941, 312 U.S. 86, 93, 61 S.Ct. 518, 522, 85 L.Ed. 598.

pable of affecting or influencing such function. And the greater weight of authority in the federal courts supports the view that materiality is an essential element of the offense described by § 1001.[12] The Government does not deny that proof of materiality is essential under § 1001. Instead, it argues only that "the false representations were material." [13]

The financial statement submitted was materially false only if it misrepresented Starrett's ability to repay a loan by misstating profitability, assets, or liabilities. Since the statement here involved was a balance sheet, not an income statement, it made no representation as to profitability.[14] No charge is made that assets were falsely listed. Hence the only question is whether the liabilities were falsely stated. The answer depends on whether appellant subordinated his loans of about $600,000, as the balance sheet indicated, or whether, as the indictment charged, the loans payable account was understated by that amount.

The specification relating to the liabilities item charged that Starrett's loans payable account was understated by the difference between $637,300 and $28,450. This difference represents the sum of $270,000, contributed to surplus on *May 3, 1950*, "as at February 28, 1950," and $339,800, transferred from loans payable to preferred stock as at September 30, 1949.

(a) The record incontrovertibly establishes that appellant transferred $270,000 from loans payable to surplus "as at February 28, 1950." [15] Indeed, the Government appears to have abandoned the contention, made at the trial, that no such transfer occurred.[16]

▇▇▇▇ (b) Formal authorization to issue additional capital stock was not secured until after the financial statement was submitted to the R.F.C. Although, for that reason, the preferred stock had not been issued *de jure*, the question remains whether the $339,800 allocated to preferred stock was, in fact a loan payable to appellant. That it was not a loan payable clearly appears from every relevant corporate act and account from November 1949 to October 1950.[17] The minutes of the stockholders' meeting held November 1, 1949, contained a resolution authorizing issuance of the preferred. Starrett's ledger as of December 31, 1949, showed a preferred stock

---

12. Rolland v. United States, 5 Cir., 1953, 200 F.2d 678, 679, certiorari denied, 345 U.S. 964, 73 S.Ct. 950, 97 L.Ed. 1383; United States v. Moore, 5 Cir., 1950, 185 F.2d 92, 94; United States v. Cowart, D.C.D.C.1954, 118 F.Supp. 903, 905; contra: United States v. Varano, D.C.M. D.Pa.1953, 113 F.Supp. 867, 868.

13. We do not reach the question whether the indictment, which was cast in terms of the statute, is insufficient for failure to specify materiality.

14. The Government contends that showing a "surplus" without designating it "donated surplus" gave a false impression of profitability. But a balance sheet is a "static report showing the net effect upon the assets, liabilities, and net worth of all business operations since the enterprise was started." Porter and Fiske, Accounting 36 (1935); see also 2 Kester, Accounting 6 (3d ed. 1934); Paton, Accountant's Handbook 3 (3d ed. 1943). It follows that a balance sheet deficit is consistent with substantial operating profits; while even an "earned surplus" may be

the remainder after deduction of operating losses. Thus, neither the R.F.C. nor any other lender could reasonably infer profitability from the existence of a "surplus."

15. The transfer was agreed to at a meeting held May 3, 1950. A certified public accountant prepared a letter incorporating the *understanding* that $270,000 in appellant's loan account was to be donated to surplus as of February 28, 1950. This letter, which was signed by appellant, was addressed to Starrett's accountants, and directed them to make the transfer on Starrett's books.

16. The Government's sole argument on appeal was that it was false to show a surplus in the face of an operating deficit. We consider that contention infra, 223 F.2d 604.

17. In October 1950, the preferred stock temporarily reverted to loans payable in order to reflect the failure to obtain official approval. A week later a new balance sheet was prepared showing "preferred stock—to be issued."

account, and there was a supporting journal entry. The financial statement prepared "as at September 30, 1949" by Starrett's accountants reflected issuance of the preferred, as, of course, did the statement of February 28, 1950, which is here involved. These acts and accounts amount to representations, to the R.F.C. and to others, that appellant was a preferred shareholder and not a creditor of Starrett.[18] Under familiar principles of estoppel, he could never have successfully asserted a claim upon Starrett as against one who extended credit in reliance thereon.[19] Since appellant's loans were effectively subordinated, the financial statement was not materially false.

*B. Objective falsity,* scienter, *and criminal intent.*[20]

■ (a) As we have seen, preferred stock had not been issued *de jure*. But it was necessary that there be evidence from which the jury could have found beyond a reasonable doubt that when the statement was filed with the R.F.C. appellant *knew* the corporation's charter had not been amended. Although appellant appears to have been active in the affairs of Starrett, guilty knowledge can-

not be inferred from that fact alone. The record makes clear that all correspondence with the Secretary of State of New York relating to the amendment of the charter was carried on by Starrett's attorney. There is no evidence that he kept in touch with Starrett's officers on the matter; indeed, Government witness Fein, vice-president and secretary of Starrett during the relevant period, testified that he had no knowledge that the preferred stock had not been issued. Moreover, as we have seen, Starrett's records uniformly reflected issuance of the preferred stock.[21] Nor was there any convincing showing of motive to falsify. As we have already indicated, appellant could not—and it would therefore be unreasonable to believe that he intended to—deny his status as a preferred stockholder for the purpose of asserting creditor's rights to the detriment of R.F.C.

■ In light of these circumstances, the one item of evidence the Government points to as showing the requisite knowledge was clearly insufficient to take this issue to the jury. That evidence was elicited in the direct examination of Government witness Burnett:

18. Moreover, in New York litigation involving appellant and the original minority stockholders of Starrett, the New York courts consistently assumed that the preferred stock was outstanding, and appellant never asserted the contrary. See Fein v. Starrett Television Corp., 1st Dep't., 1952, 280 App.Div. 670, 116 N.Y. S.2d 571.

19. See, e.g., Given v. Times-Republican Printing Co., 8 Cir., 1902, 114 F. 92, certiorari denied, 1903, 189 U.S. 513, 23 S. Ct. 851, 47 L.Ed. 924 (sole stockholder of corporation estopped from asserting claim upon corporation against its purchaser to whom he had represented that corporation was not indebted to him); In re A. C. Becken Co., 7 Cir., 1935, 75 F.2d 681, 686–687 (appellants estopped to assert "claims as against creditors who extended credit relying on the * * * financial statements and reports which did not show the existence of their claim.") See also Dustin Grain Co. v. McAllister, 8 Cir., 1924, 296 F. 611, 615; Detroit, T.

& I. R. Co. v. Detroit & T. S. L. R. Co., 6 Cir., 1925, 6 F.2d 845.

20. *Willfully* "when used in a criminal statute * * * generally means an act done with a bad purpose." United States v. Murdock, 1933, 290 U.S. 389, 394, 54 S.Ct. 223, 225, 78 L.Ed. 381. In ruling on appellant's motion for acquittal, the trial judge erroneously said that "if the act was deliberate and voluntarily done and intentionally done * * *," the element of "willfullness" was adequately supplied. The court concluded on this erroneous basis that there was sufficient evidence to go to the jury. However, in charging the jury, the court referred to the word "feloniously" which was used in the indictment and instructed that this required "evil or criminal intent." Since we set aside the conviction on other grounds, we need not decide what effect should be given to the court's error in ruling on the motion for acquittal, or to what extent that error was cured by the subsequent charge to the jury.

21. See text supra, 223 F.2d 602.

"Q. About the time you went with Starrett, Mr. Burnett, did you ever have occasion to learn from Mr. Freidus what the actual stock issue of the corporation was? A. Well, he and I had had some conversation prior to that. In fact, in his home on Tuesday, May 9, 1950.

"Q. Can you tell us the details of that conversation sir? A. At that time we had not arrived at a basis of salary or compensation and during that negotiation with him, I inquired as to whether there might be a possibility of my acquiring some of the stock of the corporation, either then or over a period of years beyond.

"He explained to me that only recently had he obtained all of the stock back in his name and that he would not permit any part of it to go to anyone from that point forward.

"Q. Did he tell you what kind of stock it was and how much of it he had then? A. He told me that there were 200 shares of no par common stock."

This testimony, the Government contends, indicates appellant's awareness in May 1950 that the corporation had no preferred stock. But the witness testified only as to appellant's understanding of the amount and kind of *common stock;* the pronoun "it" in the prosecutor's final question clearly refers to the appellant's recently acquired stock—which was common stock. Appellant's reported answer, "200 shares of no par common stock," described both the amount and kind of such stock. His failure to refer to the preferred can have no probative significance on the issue of whether, in fact, he believed such stock had been issued.

■ (b) The indictment charged the financial statement was false in listing a surplus when "in truth and in fact, * * * Starrett * * * was actually operating at a deficit." Appellant made total contributions to surplus of $430,-000.[22] This sum, reduced by an operating deficit of $320,000, provided the basis for the $110,000 surplus entry. The entry can only be considered false if it is a representation that the Company had no operating deficit. Accounting authorities make clear that it is not such a representation. They view a balance sheet as reflecting the net effects of business operations, and not a profit or loss for any particular accounting period.[23] Thus, even an "earned" surplus may be the remainder after deduction of substantial operating deficits. Although, under preferred accounting practice, surplus is earmarked "earned" or "donated," it does not follow that failure to do so renders the entry false within the meaning of a highly penal statute.

(c) The loans payable specification was derived from the preferred stock and surplus specifications. Since, as we have seen, there was insufficient proof that appellant knew that issuance of the preferred stock had not been formally effectuated, and since the transfer to surplus was, in fact, made on Starrett's books, this specification must fall. Moreover, for reasons indicated above, the loans payable account was not understated.

The conviction will be reversed and remanded to the District Court with instructions to enter a judgment of acquittal.

Reversed and remanded for acquittal.

22. This is the sum of $160,000 contributed "as at September 30, 1949" and $270,000 contributed "as at February 28, 1950." See note 15, supra.

23. See note 14, supra.