Joseph P. CONRAD, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 16878.

United States Court of Appeals
Fifth Circuit.

May 16, 1958.

Rehearing Denied June 13, 1958.

Rudolph F. Becker, Jr., New Orleans, La., for appellant.

M. Hepburn Many, U. S. Atty., Prim B. Smith, Jr., Asst. U. S. Atty., New Orleans, La., for appellee.

Before HUTCHESON, Chief Judge, and BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This is an appeal from a conviction under Count One for false statements made to Internal Revenue Officers, 18 U.S.C.A. § 1001, and under Count Two for perjury before a Grand Jury, 18 U.S. C.A. § 1621. Except that each count describes differently the nature of the proceedings in which the questions were asked and answers given, both allege in identical terms that on February 25, 1957, under Count One the appellant made false, fictitious and fraudulent statements and on February 26, 1957, under Count Two willfully, knowingly, unlawfully, feloniously, corruptly and contrary to his oath swore:

"* * * in substance and effect:[1]

"That

"[1]  he had never knowingly

"(a)  collected or

"(b)  distributed graft moneys and

"[2]  that he had no personal knowledge of any graft moneys paid to and distributed among members of the New Orleans Police Department for the operation of illegal businesses;

"whereas as he then and there well knew, this statement was false in that

"[1x]  he had knowingly collected and distributed graft moneys and that

"[2x]  he did have personal knowledge of graft moneys paid to and distributed among members of the New Orleans Police Department for the operation of illegal businesses."

In view of our conclusion that the evidence was not, and cannot be, sufficient to sustain these charges, we need not determine whether the indictment sufficiently alleged materiality of the statements[2] made or testimony[3] given. Nor do we pass upon the contention made in the motion to dismiss that the indictment for perjury was so vague and did not sufficiently set forth the statement of facts constituting the offense charges that it did not enable the defendant to prepare his defense or plead from jeopardy.  Berger v. United States, 295 U.S. 78, 82, 55 S.Ct. 629, 79 L.Ed. 1314, 1318.  While this criticism[4] of the indictment does not present for us a precise point for review, it is certainly a significant factor.  For it points up the fact that the charge was not for falsely stating or swearing to a specific fact in response to one or more specific questions but was, on the contrary, as the indictment so plainly said, for things generally stated "in substance and effect."

This brings us right to the heart of this case.  For the Government's theory was that if any statement made to the Revenue Agents or to the Grand Jury was in the category of [1] (a) (b) or [2]

1.  To sharply emphasize the nature of the false statements we have inserted the identifying numbers [1] and letters (a), etc.

2.  Appellant presses hard our decision in Rolland v. United States, 5 Cir., 200 F. 2d 678, requiring that the indictment under 18 U.S.C.A. § 1001 charge either in haec verba or in substance that the statement was material.  The Government undertakes to distinguish the Rolland case and cites others as partially or altogether contrary to it: e. g. Freidus v. United States, 96 U.S.App.D.C. 133, 223 F.2d 598, especially footnote 13, at page 602; Fisher v. United States, 9 Cir., 231 F.2d 99; United States v. Silver, 2 Cir., 235 F.2d 375; United States v. Lange, D.C.S.D.N.Y., 128 F. Supp. 797; United States v. Varano, D.C.Pa., 113 F.Supp. 867; United States v. Okin, D.C.N.J., 154 F.Supp. 553.

3.  The Government, asserting that in a perjury indictment the rule is well established that materiality may be charged by a general allegation of its materiality or by facts which, of themselves, show that it was material and that either is suf-

ficient, cites: Markham v. United States, 160 U.S. 319, 16 S.Ct. 288, 40 L.Ed. 441; Hendricks v. United States, 223 U.S. 178, 32 S.Ct. 313, 56 L.Ed. 394; Williams v. United States, 5 Cir., 239 F.2d 748, certiorari denied 353 U.S. 975, 77 S.Ct. 1061, 1 L.Ed.2d 1138; Travis v. United States, 10 Cir., 123 F.2d 268.

4.  This is aptly set forth in appellant's brief:
"By reference thereto, it readily may be seen that the defendant has not been informed as to the specific question, or questions, asked and the answer, or answers, which the government contends are false and incorrect.  No information whatsoever as to even the year, or years, involved has been set forth in the Indictment.  Is the defendant called upon to defend certain acts allegedly committed in the year 1920? 1930? 1940? 1950? 1951? 1952 or 1953?  How many assignments of perjury or false statements will the defendant be expected to defend?  When did the defendant participate in the alleged receipt of certain moneys?  How many times, and on what dates, does the government contend that he so participated?"

and was then proved to have been false, a case was made out if the jury found, as they obviously could, materiality and the essential culpable willfulness. And if the theory is right, the Government met it.

At the outset, the Government proved by the transcript of the statement given to the Revenue Agents and from the reporter's transcript of the Grand Jury proceedings that appellant denied here and there that he had collected graft money, had collected it from specified persons or places, or that he had distributed it to other policemen in his precinct. Likewise these documentary records showed that in so many words he denied having personal knowledge of any graft money being paid to New Orleans policemen for operation of illegal businesses. Following up this theory the Government then offered creditable testimony from fact witnesses showing that for all or a part of the time in 1951 through sometime in 1953, appellant had collected payoffs from specified persons engaged in illicit activities and had distributed all or a part of this from week to week to fellow officers of the precinct. Since appellant was, by this means, tied into actual graft payments, it also established that he had *personal* knowledge of the graft system in the police force.

█ But it is well to remember at this point that appellant had not been indicted, as he might have been, for making these specified statements which were then proved to have been false and made under circumstances of knowledge sufficient to attribute to him an evil purpose. Rather he had been indicted for having stated the facts of [1] and [2] "in substance and effect." That meant that *all* of his testimony had fairly to be considered to determine whether in its substance and by its general tenor and effect, he had really said what the Government charged.

█ And it was here that the Government's case broke down. For a reading of this record, fortified by briefs and oral argument, leaves the instantaneous and ineradicable impression that while appellant was engaging in an awkward, clumsy, unimpressive and ofttimes ludicrous, coy, disingenuousness, he told both Agents and Grand Jury substantially what is now claimed he denied.

After sparring and fencing, much of it in a crudely-conceived semantical debate on whether picking up envelopes (which, it was plain to all concerned, contained money) was collecting money, whether leaving such envelopes (when it was equally plain all knew what was to be done with them) in the customary file basket along with a supposed sandwich was "distributing" or "paying" money to officers, or whether he could know something "personally" unless he had seen it with his own eyes, he removed all uncertainty. For he acknowledged that he had himself received [5] $5.00 each week for a considerable time, had picked up envelopes,[6] had engaged as a pickup [7]

---

5. In the following notes 5 through 10, "ST" refers to the statement given to the Agents and "GJ" refers to Grand Jury testimony.
   ST (245):
   "You have never received any part of this racket money at any time?
   "A. One minute, clarify that; I also told Mr. Perry [one of the interrogating Agents] everytime I put an envelope in the basket, there was always an envelope in there for me. And they had $5.00 in that envelope for me. I told the man that."

6. GJ (176):
   "I ask you again, in view of that situation, whether you ever collected any monies while in the Fifth? A. Well,

if picking up those envelopes that I did—
   "Q. How many times did you do that? A. I think it was eight or nine times over a period of nine months it happened—nine, ten months, something like that. If picking up those envelopes was money, I never looked at them.
   "Q. You never opened the envelopes? A. No, sir."
   GJ (180):
   "Q. Let's see if you can remember some more of this picking up of envelopes then that you have stated, under oath, over a period of nine months—A. Yes, sir. Every so often—this didn't happen spontaneously—this was every so often that I was asked to pick it up. If that was money, then I picked up money.

man, and had known so well that graft amongst public officers unfaithful to their trust was so common [8] that he was anxious to leave [9] the precinct and his

"Q. Who else was asked to pick up money? Officers? A. You mean when I picked it up, Cap?

"Q. During the same period of time? A. That I can't answer. I don't know."

GJ (179):

"Q. What other places do you remember that you picked up money, picked up envelopes? A. Cap, I can't hardly remember—that's a long time ago."

ST (237):

"Q. Mr. Conrad, these gentlemen here are interested in knowing places from which you collected. They don't know everything that you've told me. Would you repeat for them for the record some of the places that you've picked up envelopes? A. Lapeyrouse Street, Johnson, or—I think it was Johnson I ain't sure—that's so   *   *   *   long ago. Another fellow around there, in the back of Rampart, somewhere around Rampart Street, around the school, I had one there. Only about seven of 'em I picked up twice —that wasn't in succession, I'll tell you that, I never picked them up—"

ST (243):

"Q. Well, according to what I've heard you testify this afternoon, the only thing you've done, you've picked up seven or eight envelopes over a period of about three years, is that right? A. No. No, sir, I say about three months before that, everytime I was on three to eleven, picked up one or two envelopes that month, each month. That's over a period of about nine or ten months, something like that.

7. GJ (201):

"By The Foreman:

"Q. Mr. Conrad, you made reference a minute ago to the fact that you are under oath and you want us to believe you. I think in your previous testimony earlier you testified that you never received an envelope, yet now you are telling us you did— A. Cap, the man asked me if anybody gave me an envelope.

"Q. Let's not play games— A. I am not playing games; I am telling you the truth. Nobody put a thing in my hand personally, and if they did I'd tell you.

"By Mr. Smith [Assistant United States Attorney]:

"Q. When Slim Williams put the envelope in your hand, that was not giving it to you? A. That was for somebody else—it was not for me.

"Q. He gave them to you for someone else? A. I was asked to pick it up, and I picked it up and brought it back down there, yes.

"By Mr. Many [United States Attorney]:

"Q. Isn't it a fact that you made regular collections? A. If you call that 'regular collections,' I made it. If you call what I am telling you regular collections, I made it."

ST (237):

"By Special Agent Adkins:

"Q. Mr. Conrad, weren't you the pickup man for the Police Force for this protection money? Wasn't that a part of your regular duty? A. No, sir. If you call what I did pick-up, then I'll have to admit I was a pick-up man."

ST (238):

"Q. Under whose instructions did you pick up these envelopes? A. If I had a call, call the Station on it, I'd call the Station and I was instructed to go do it.

"Q. Were you told to go pick up the envelope? A. Each time I was called I had to pick up one envelope. That's it."

8. GJ (166):

"Q. Mr. Conrad, what the Grand Jury is interested in, as you probably know from rumors in the Police Department, is an investigation into the graft system, particularly the amount of money received, amounts of money from gamblers, prostitutes, and other operators of illegal businesses, lotteries, and so forth, books, the amounts which were received by the Police Department in return for which those operators of the illegal businesses were able to go on. They bought protection, in other words.

"Now, do you know of such a graft system, of your own knowledge, in the Police Force? A. After all, it has been going on for five years—I know the town, according to the men that were questioned, and so on.

"Q. A lot of them— A. Personally I didn't know of it."

9. GJ (184):

"Let's make it specific; at the time, 1949, '50, '51, '52 part of that time that you were at the Fifth Precinct or Fifth District, did you then know of any system of graft that operated? A. Frankly speaking, I had a funny idea about it, Cap. That is why I wanted to get out of that Precinct I worked. I pleaded to God to get me out of there. I was lucky to get out.

"Q. What made you have that idea? A. Because when I asked a question about the envelopes I picked up, the only thing, the only answer I got was on the 'phone. They called me, and I got a

conscience almost drove him to tell [10] all to a Revenue Agent.

The Government chose to couch its charges in general terms that appellant in his testimony or statement as a whole had falsely stated these things. If that total evidence fairly considered would lead to opposite inferences and conclusions, the charges failed. Deliberately couched in this broad way as it was, the case was not then like those urged by the Government in which, with one or more of a series of false statements assigned in the indictment, proof of falsity in a single respect is sufficient.[11] Nor, since the indictment was not for an *earlier* specific false statement or statements was the case the same as, or similar to, the unpermissible effort to escape criminal culpability as a matter of law by subsequent recantation in the same proceeding.[12]

Here the last line of his statement and the last syllable of his testimony was as

important as the first. For until all was heard and considered, one could not determine whether such testimony or such statement "in substance and effect" affirmed or denied these critical facts. If as a whole it permitted the inference which the Government asserts to have been the truth, or at least created a reasonable doubt thereon, there was nothing to recant, it was not then proved false in any such respect, and the proof was insufficient as a matter of law.

As the case under this indictment turns entirely on the content of the statement and the Grand Jury testimony, each of which is now beyond expansion, contraction, alteration or repair, the deficiency in proof cannot possibly be overcome in a retrial. Consequently, no purpose would be served in exercising the discretion to reverse and remand for a new trial, Bryan v. United States, 338 U.S. 552, 70 S.Ct. 317, 94 L.Ed. 335, re-

---

little curious and I asked. I wanted to know who I was talking to the, definitely wanted to know the full name, and he said, 'what's the matter? You getting cute?' and he hung up. That was as far as it went with me. And that is the truth, that's as far as it went with me. Then I realized there must be something wrong. That is when I realized that I was nothing but a green policeman down there too."

**10.** ST (243):
"Q. Mr. Conrad, did you know that there was an organized system of graft going on in the Police Department— A. Well, I'll tell you, I knew it was going on—that's one reason why I tried to get away from it. There was one time, one time, I was talking to Mr. Caballero [one of the Revenue Agents conducting the interview] at a party, I almost told him everything right there. I started to and stopped—I don't know what made me stop—but I was just one of those that's always been scared, and I'm still scared, like I told Mr. Perry [Interrogating Agent] what I did. I found out I did wrong and I wanted to get it off my chest—if there is anything that they are going to have to do to me, just have to take my punishment—I did it."

**11.** The Government cites: Warszower v. United States, 312 U.S. 342, 61 S.Ct. 603,

85 L.Ed. 876; Stevens v. United States, 6 Cir., 206 F.2d 64; Cohen v. United States, 9 Cir., 201 F.2d 386; Todorow v. United States, 9 Cir., 173 F.2d 439; United States v. Mascuch, 2 Cir., 111 F. 2d 602, certiorari denied 311 U.S. 650, 61 S.Ct. 14, 85 L.Ed. 416.

**12.** This is clearly not permitted. United States v. Norris, 300 U.S. 564, 575, 576, 57 S.Ct. 535, 538, 81 L.Ed. 808, 813, 814: "* * * He [petitioner] would have us hold that so long as the cause or proceeding in which false testimony is given is not closed there remains a *locus poenitentiae* of which he was entitled to and did avail himself. The implications and results of such a doctrine prove its unsoundness. * * * Deliberate material falsification under oath constitutes the crime of perjury and the crime is complete when a witness' statement has once been made. * * * The plain words of the statute and the public policy which called for its enactment alike demand we should hold that the telling of a deliberate lie by a witness completes the crime defined by the law. This is not to say that the correction of an innocent mistake, or the elaboration of an incomplete answer, may not demonstrate that there was no willful intent to swear falsely. We have here no such case."

hearing denied 338 U.S. 957, 70 S.Ct. 491, 94 L.Ed. 590, and the case is therefore reversed with directions to enter judgment of acquittal.

Reversed with directions.