## UNITED STATES v. LITBERG.
### No. 9749.

United States Court of Appeals
Seventh Circuit.
June 14, 1949.

Maurice J. Walsh, Chicago, Illinois, for appellant.

Otto Kerner, Jr., U. S. Atty., John A. Looby, Jr., Asst. U. S. Atty., Chicago, Ill., for appellee.

Before MAJOR, Chief Judge, and MINTON and DUFFY, Circuit Judges.

MAJOR, Chief Judge.

The defendant was charged in a four count indictment, each of which alleged a violation on November 29, 1947, of Sec. 265 [now § 472], Title 18 U.S.C.A. The first count charged the defendant with passing upon one Roy Worst a counterfeited $5 federal reserve note, with intent to defraud and with knowledge that it was counterfeit. The second count charged the passing of a similar note upon one Mildred Stevens, with intent to defraud and with knowledge that it was counterfeit. The third count charged the passing of a similar note upon Jean Johnson, with intent to defraud and with knowledge that it was counterfeit. The fourth count charged the defendant with possession of four counterfeited $5 federal reserve notes, with knowledge that they were counterfeit. Three of the counterfeited notes referred to in this count are the same as those described in counts one, two and three. The fourth note

described in this count is one which it is claimed the defendant burned.

The case was tried to the court without a jury, and at the close of the government's case the court dismissed count three on defendant's motion, for want of proof. The court denied a motion to dismiss as to counts one, two and four, found the defendant guilty, and upon such finding on June 23, 1948 entered its judgment of conviction, from whence this appeal comes.

The principal contention before this court, urged with vigor and apparent sincerity, is that the evidence is not sufficient to support the judgment. Such a contention, where the proof in support of an essential element of the crime is doubtful and particularly where it depends upon inferences drawn from circumstances in proof, presents a difficult and perplexing problem for a court of review. On the one hand, we must keep in mind the oft repeated rule that the weight and credibility to be attached to testimony of the witnesses is a matter for the trier of the facts and that we are required to take that view of the evidence most favorable to the government. On the other hand, while the trier of the facts is entitled to draw all reasonable inferences from the circumstances in proof, a court of review is charged with the responsibility of determining the reasonableness of such inferences. In other words, an inference may not properly be relied upon in support of an essential allegation if an opposite inference may be drawn with equal consistency from the circumstances in proof. In United States v. Tatcher, 3 Cir., 131 F.2d 1002, 1003, the court reversing a conviction based on inferences stated: "To justify conviction of crime where the evidence relied upon is circumstantial in nature the evidence must be such as to exclude every reasonable hypothesis but that of guilt. United States v. Russo, 3 Cir., 1941, 123 F.2d 420. As we have seen, the evidence relied upon to sustain the defendant's conviction is as consistent with his innocence as with his guilt."

In United States v. Russo, 3 Cir., 123 F. 2d 420, 423, where knowledge was an essential element of the offense charged, it was held a judgment could not be sustained

where the inference of lack of knowledge was as readily deducible as that of knowledge. See also Isbell v. United States, 8 Cir., 227 F. 788, 792; Pierce v. United States, 6 Cir., 115 F.2d 399, 400; Hammond v. United States, 75 U.S.App.D.C. 395, 127 F.2d 752, 753.

The scienter of the offenses charged is that the notes were passed or possessed "with intent to defraud and with knowledge that they were counterfeited," and in the absence of proof of such intent and knowledge a judgment of conviction cannot stand. United States v. Carll, 105 U.S. 611, 613, 26 L.Ed. 1135; United States v. Ruffino, 2 Cir., 67 F.2d 440.

Thus, our problem is whether we, from the facts and circumstances in proof, should accept the inference indulged in by the trial court that the defendant was possessed of such intent and knowledge. In deciding this question we think we must accept the proof most favorable to the government's theory, even though some of it is of doubtful validity and open to serious dispute. In this view a statement of the controverted facts is unnecessary.

The defendant is a married man with a family of three children. He is a baker by trade and is engaged in the bakery business with two of his brothers. The business has been in existence for four years. He also owns the Arrow Kite Company, which manufactures a new design in kites. A number of witnesses testified at the trial that he sustained a good reputation in the community for truth and veracity and for being a law abiding citizen. Insofar as the record discloses, he has not been in any trouble or difficulty prior to the instant case.

On the evening of November 28, 1947, defendant according to his testimony, which is not disputed, went to the Stadium on West Madison Street to attend a basketball game. While there he made bets with various persons and won about $60. He left the Stadium shortly after midnight and visited two taverns, in each of which he had a drink. After leaving the second tavern he met Esther Pyse, and at his invitation they visited another tavern where they had a drink. The two of them left this place and went to Le Meck's Restaurant at 5300 Lake Park Avenue, Chicago, arriving sometime about 2 a.m. (November 29). Defendant had theretofore frequently patronized this place as it was located near his place of business; in fact, his business at one time was conducted in the same building with the restaurant. He was acquainted with the employees there and they were acquainted with him. The government's case rests upon proof of defendant's activities while at the restaurant on this occasion.

Defendant and Pyse first visited the tavern section of the restaurant where they were served five or six drinks by Roy Worst, a bartender. Worst had known the defendant for a year and a half and also knew Pyse as a former employee of Le Meck's Restaurant. Worst, at defendant's request, changed a $5 bill and placed it in his billfold. This is the note described in the first count of the indictment. Worst did not discover the bill was counterfeit until 7:30 that night. The defendant and Pyse left the tavern section and went to the restaurant part about 4 a.m., where they remained for almost an hour. They were waited on by Caroline Rolleck, who was acquainted with both the defendant and Pyse.

Rolleck testified that she saw the defendant light a cigar with a $5 bill. We will later discuss this incident which, in our opinion is the only circumstance of any consequence upon which an inference of knowledge on the part of the defendant could be deduced. The bill involved in this incident is one of those referred to in the fourth count of the indictment.

While sitting in a booth, the defendant and Pyse were joined by Louise Diedrich, another employee of Le Meck's Restaurant whom they invited to have a drink. The three of them were shortly joined by Henry Rose. Diedrich and Rose left when defendant and Pyse were served steaks which they had previously ordered. Subsequently the defendant tendered to Mildred Stevens, the cashier, a $5 bill in payment of his dinner check which she accepted and placed on top of other $5 bills in the cashier's drawer. This is the note described in the second count of the indictment. It was some time later that Stevens became sus-

picious and turned the $5 bill over to the manager, who tore it in two, decided it was counterfeit and called the Chicago police department.

Jean Johnson was also a waitress in the restaurant on the night in question. Some day subsequent to November 29, she was told by the manager that she had turned in a counterfeit $5 bill on November 29. This is the note described in the third count of the indictment. Johnson testified that she was acquainted with the defendant and she did not receive the bill from him. She described the man from whom she received the bill and the description did not meet that of the defendant. The court thereupon dismissed this count for failure of proof.

■ The mere passing of these counterfeit bills is not sufficient to show knowledge on the part of the defendant that they were counterfeit. United States v. Ruffino, 2 Cir., 67 F.2d 440, 441. And the fact that they were readily accepted by Worst, the bartender, Stevens, the cashier, and Johnson, the waitress, all of whom we assume were experienced in handling money, dispels the thought that there was anything connected with their appearance from which knowledge that they were counterfeit could be imputed to the defendant.

In a colloquy between the court and counsel, the following is shown:

"The Court: You don't need to talk about knowledge, because if I believe he burned a bill, that is enough. He would not burn a good one.

"Mr. Walsh: Well, these men, of course, were drinking, your Honor.

"The Court: I know that. That is most unusual, I must say that, for anyone to burn a bill, good or bad."

■ Thus it appears that the court below strongly relied upon the burning episode as proof of knowledge. Defendant argues that the testimony of Rolleck as to this incident is contrary to the weight of the evidence. If we were the trier of the facts on this record before us we would be inclined to agree. The trial court, however, evidently believed her testimony and we think we must accept it. Thus there is no need to discuss the conflicting evidence regarding this incident. In this connection it may be observed that Willie Braxton, a porter, while sweeping the floor under the booth occupied by defendant and Pyse found the torn and burned remnants of a purported $5 bill. This discovery was made about two hours after the defendant and Pyse had left the place.

We agree with the lower court that it "is most unusual * * * to burn a bill, good or bad," and think it about as unusual in one case as the other. We are not impressed, however, much less convinced, that this incident under the circumstances shown was such as to reveal defendant's knowledge that the bills were counterfeit. It must be assumed that the defendant at the time this incident took place was well under the influence of liquor. In a period of about four hours (from midnight to 4 a.m.) he had had drinks at three different places before arriving at Le Meck's Restaurant, had there been served five or six drinks at the bar and had additional drinks with his friends at the table prior to the burning of the bill. It is reasonable to think that by that time his condition was such that it was a matter of complete indifference to him whether the bill was genuine or counterfeit. The government in its brief states, "Being slightly under the influence of liquor by that time, the defendant undoubtedly to some extent lost his normal sense of caution and judgment." We suspect that this is a mild statement and that it would be more accurate to say that he was greatly under the influence of liquor and had lost all sense of caution and judgment. Such being the situation, it appears quite likely that defendant would have entertained no greater scruples against destroying a genuine bill than one that was counterfeit.

■ Moreover, it is almost incredible that a person of normal intelligence if he knowingly had counterfeit money in his pocket would pass by a number of places where he was a stranger and wait until he arrived at a place where everybody knew him to display his knowledge and perpetrate his fraud. In our judgment, the burning of the bill under the circumstances, while an unusual incident, furnishes an insecure premise upon which to base an inference that the defendant had knowledge that it

was counterfeit. It is far more reasonable, so we think, to infer that defendant's act was the by-product of too much liquor rather than an effort to destroy a bill because he regarded it as worthless.

Other circumstances relied upon by the government are of little or no consequence. There was testimony that the defendant carried a roll of bills in his shirt pocket and that he asked Henry Rose while seated at the table if he wanted any money. This is further corroboration of the thought that the defendant was drunk rather than that he had knowledge that the money was counterfeit. The government also emphasizes the testimony of Samuel T. Goldman of the United States Secret Service, who testified that the money in question was counterfeit and gave his reasons therefor. We need not narrate this testimony because there is no question but that the money was counterfeit. It is sufficient to observe that there is not the slightest reason, either from the testimony of Goldman or from an examination of the counterfeit money which is before us, to argue or think that its appearance was such as would put a recipient or possessor on notice that it was not genuine. While it does not require too careful an examination to disclose its spurious character, yet we have no doubt but that the average person would accept it as genuine. That this is so is evidenced from the fact, as already noted, that each of the three employees in the restaurant accepted a $5 bill (two from the defendant and one from some other person) without detecting that they were counterfeit until subsequently when the matter was called to their attention. Certainly the appearance of the bills in question cannot be relied upon to impute to the defendant knowledge that they were counterfeit.

▮ Opposing inferences no doubt will be drawn by different people from a given state of facts. There may be room for difference of opinion as to what may reasonably be inferred from the circumstances of the instant case. It is our judgment, however, that it is far more reasonable to infer that defendant's activities were the result of carelessness or indifference occasioned by an over supply of liquor than that they show knowledge that the bills were

counterfeit or that he passed them with intent to defraud. Such being our conclusion, the judgment must be reversed. It is so ordered.