**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Phillip MASIELLO and Francis Lester Stickel, Defendants-Appellants.**

**No. 336, Docket 23917.**

United States Court of Appeals Second Circuit.

Argued May 10, 11, 1956.

Decided July 18, 1956.

Certiorari Denied Oct. 22, 1956.

See 77 S.Ct. 100.

280

Ferdinand Pecora, New York City (Schwartz & Frohlich, Ludwig Teller, and David H. Horowitz, New York City, on the brief), for defendants-appellants.

Peter Megargee Brown, Sp. Asst. U. S. Atty., S. D. N. Y., New York City (Paul W. Williams, U. S. Atty., New York City, on the brief), for plaintiff-appellee.

Before CLARK, Chief Judge, and FRANK and HINCKS, Circuit Judges.

CLARK, Chief Judge.

Defendants appeal from a judgment upon a jury verdict convicting them of conspiracy to affect interstate commerce by extortion in violation of the Anti-Racketeering Act, 18 U.S.C. § 1951, and sentencing them to five years in prison. Masiello was a business agent, and Stickel the Secretary and Treasurer, of Local No. 445 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL. The members of this local union were employees of milk haulers, who were engaged in transporting milk received from the farms of six neighboring states to the New York metropolitan area. Since these milk haulers were dependent for the uninterrupted progress of their operations upon the receipt of a union contract and upon continuing union good will, they were vulnerable to threats of a work stoppage, made even

more portentous because of the perishable nature of their product.

Masiello and Stickel were indicted on a single count of conspiracy, and no evidence implicating other persons was introduced at the trial. Hence, as the jury was told, the government had to prove the guilt of both defendants, or the case against both failed. The evidence that Masiello committed substantive acts of extortion is abundant, as defendants conceded; but they contend that the evidence tending to incriminate Stickel is too tenuous to support the jury's verdict, and that hence both convictions must be reversed. See Turinetti v. United States, 8 Cir., 2 F.2d 15. We cannot agree, for we think that a study of all the evidence reveals a pattern of events from which an intelligent jury could rationally and as a matter of common sense undoubtedly would find Stickel an active participant in this continuing and profitable conspiracy.

By 1949 Stickel was in control of teamster Local No. 445. Although the union had a number of committees, the record indicates that Stickel was in charge of executing collective bargaining contracts with over-the-road milk haulers, members of the Dairy Transport Association, Inc. (DTA). Stickel announced when the contracts would be signed, where, and under what circumstances. He was in a position to exert control over the haulers by the use of crippling strikes against their operations. His was the authority and power necessary to enforce a successful scheme of extortion.

In identical letters, dated May 27, 1949, and sent to the haulers, Stickel stated that an agreement had already been reached between the DTA and Local No. 445. He enclosed copies of the uniform contract and instructed the haulers to come to the union office on June 1 to sign the contract. The letters, signed personally by Stickel as a union officer, ended with the warning that he "expect[ed]" the recipient to "sign for us" and "clear up the issues which are holding up completion of our negotia-

tions." [1] Although there was evidence that some negotiating had taken place in the spring, there was no evidence that at the time the letters were sent any negotiations lay uncompleted or any issues remained to be cleared up unless it be the claimed payoff to Masiello and Stickel, as asserted by the government.

Four hauler-witnesses testified that Masiello communicated with them at various times before the meeting of June 1 and demanded that they make payments of sums in cash in amounts of either $300 or $500 as the price of receiving the contract. On the appointed day the haulers—those testifying and others—appeared at the union office and were called one by one into a room about 10 x 20 feet in size wherein Stickel was seated behind a table with the contracts piled in front of him. Masiello was also present in the room and, according to some of the witnesses, was seated at the table with Stickel. As one witness put it, the two men were "within handshaking distance" of each other. After Stickel and the hauler had signed the agreement, the hauler either handed a plain white envelope containing the requested cash to Masiello or placed the envelope on the table where the men were seated. Although according to this testimony Stickel did not actively participate in the transfer of cash or take overt notice of it, there was no effort made to conceal the transfer from him.

After the meeting of June 1 Masiello visited one of the participating haulers and told him that a mistake had been made in the amount of money he had handed over in the envelope. This hauler then paid over more cash. Similarly another hauler paid $500 more that year.

In the following three years similar conferences between Masiello and the haulers were followed by the receipt of a union contract by the haulers and the receipt of cash by Masiello. One employer, Turco, paid $2,000 in 1950, $2,500 in 1951, and another $2,500 in 1952. In early 1953, when he temporarily fell behind in his 1952 payments, he was exhorted to hasten his payments by Masiello, who complained that Stickel was anxious to receive the money.

Another hauler, Gilnack, received the letter of May, 1949, but failed to appear

---

[1]. "International Brotherhood of Teamsters, Chauffeurs Warehousemen and Helpers of America
 "Affiliated with the American Federation of Labor
 "(Vignette)

 "Lester Stickel Local Union
 "Secretary-Treasurer No. 445
 "2 Post Street
 "Yonkers 5, N.Y.
 "Telephones:
 YOnkers 3–3640—YOnkers 3–7997
 May 27, 1949
 "Gentlemen:
 "On the 2nd day of February 1949 an agreement was reached by and between the Dairy Transport Association, Inc. of Middletown, N. Y. and our Union. A contract was drawn up and a stipulation was attached thereto setting forth the agreement as it was settled and also in the stipulation is the following:
 "It has been agreed that the Employers coming under the jurisdiction of the above named Local Union who are members of the Dairy Transport Association will sign a separate but uniform contract as attached hereto.
 "The Contract and Stipulation was signed by the Union and the parties representing the Association, namely, Mr. Marcus and Mr. Nye. We have been trying to clear up the issue of a signed contract for sometime with the Haulers, members of your Association.
 "The matter of a signed contract was brought to the attention of our Executive Board and they acted upon the matter in the following manner and ruled that—there must be a signed contract covering the individual haulers of the milk without further delay. The actions of the Executive Board was approved of by the membership so therefore we are arranging to have our Representatives at our Middletown office, located at 32 James Street, on Wednesday, June 1st, 1949 at 1 P. M. with a contract to cover your operation which we expect you will sign for us and clear up the issues which are holding up completion of our negotiations.
 "Thank you.
 "Very truly yours,
 "Lester Stickel,
 "Secretary & Treasurer,
 "Local Union No. 445.
 "Lester Stickel/lm
 "ceiu;153"

at the meeting of June 1. Shortly thereafter a strike of his milk hauling operations began and he hurried to the union headquarters, where Stickel presented him with a contract to sign. Masiello was not then present; but a few weeks later he told Gilnack that Stickel was "impatient" for his money, and Gilnack paid about $750 over a period of several months.

Late in 1949 or early in 1950 Stickel and Masiello visited Gilnack's garage and instructed him to hire an additional employee, one Richard Winters. Gilnack refused on the ground that he needed no further employees; and as a result his operations were struck for four or five days. Then Masiello advised Gilnack to hire one Pizzo, a labor relations counselor, to "straighten the thing out." Later in the presence of Stickel and Masiello, Pizzo told Gilnack that he would have to hire Winters as a shop steward, a union-designated position.

At this time the subject of retroactive pay for Gilnack's employees arose. Pizzo told Gilnack in the presence of both Stickel and Masiello that he would have to pay $1,200 in "retroactive pay." Masiello later at different times and places collected this sum from Gilnack in cash installments. The evidence did not show that any of it ever reached Gilnack's employees, and the inference remained strong that it was of a piece with the other payments made Masiello. Additionally and in a manner similar to that of other employers, Gilnack made further payments of about $750 a year to Masiello in 1950, 1951, and 1952.

Paul F. Hillman, another hauler, in 1949 received a demand from Masiello for $500 as the price of the new contract; and when he received Stickel's letter of May 27 there was "no question" in his mind what its final sentence meant. Still he refused to report for the payoff, and his milk hauling operations were struck at 3:00 a. m. Faced with business disaster unless he got the milk rolling, Hillman reported to Stickel to sign the contract and was then taken downstairs by Masiello, who demanded the money. Feeling "over a barrel" Hillman consented and some time later paid $250 in cash and also an additional sum later in the year. He made other substantial extortion payments in subsequent years.

In 1953 there was a meeting between Stickel and Masiello and Hillman to discuss the transfer of certain union drivers from another local to Local No. 445. In discussing the comments of another union official about such a transfer, Stickel said that this official wanted $10,000 for the transfer of certain Hillman employees; Stickel observed that the official was "crazy asking *anything like that*."

Then Masiello and Stickel offered their help to Hillman in effecting the necessary transfer. Stickel told Hillman that he (Stickel) "knew everything that Masiello knew." Masiello, in turn, advised Hillman that he (Masiello) "knew everything that Stickel knew." After lunch Masiello took Hillman from the hotel dining room, where they had been sitting, to the lobby, where he demanded $125 per man for the transfer. As a result of the conversation Hillman paid Masiello $500.

In the summer of 1953 after certain of the haulers had complained to the International Union, a telegram was sent to Stickel ordering him to cease negotiations on all milk contracts. After this the conspiracy terminated and no further payments were made.

In December, 1953, Thomas L. Hickey, a vice president of the International Union, took over control of Local No. 445 as a trustee and informed Stickel that the officials of the local union were suspected of running it for their own benefit. Then Masiello told Hickey in the presence of Stickel that he (Masiello) would take the "rap" if Hickey would "lay off Stickel." Later Stickel approached Hickey with the suggestion that he go along with the "deal" offered by Masiello. Elaborating, Stickel specified that Masiello would "take the rap" if Hickey would "lay off Stickel" and "let Stickel go free."

The question presented is whether or not on the basis of all the evidence, of which the above is a summary of the more important elements, it was proper to submit the case for the determination of the jury. The defense offered no evidence and the defendants did not take the stand. This is the sole issue. If a jury question was present, it was properly submitted to the jury under a charge which carefully stated the requirements of burden of proof in criminal cases and to which no exception is made.

Defendants suggest that all of the government's evidence is consistent with an hypothesis (1) that Stickel was ignorant of Masiello's activities or (2) that Stickel, though not ignorant, was benevolently indifferent, took no active part, and received none of the spoils. But for all practical purposes they must rely entirely on the first hypothesis and its asserted strength. For even if the jury accepted the latter alternative, it could, and, indeed, rationally should, find the defendants guilty. There are times, of course, when a sophisticated bystander may rely on his own indifference as innocence; but that can hardly apply to a powerful union leader whose coercive force is amply attested and is actually the foundation for the illegal acts charged. If such a one knows and permits the use of the threat of his power to extort payments from the employers, he has made himself a conspirator, whether he shares in the illicit proceeds or not. So the only threat wielded by Masiello was the notorious power of Stickel to withhold a union contract or to call a crippling strike of hauling operations. For Stickel to issue calls for the signing of contracts and to order strikes for "non-cooperation," knowing that Masiello was using these manifestations of power to extract money from the haulers, would be to make himself an active participant in Masiello's scheme.

Further, as a practical matter Stickel could hardly have been merely benevolently indifferent to activities of Masiello of which he was aware. Thus Stickel was an important official of the union; and both his own and the union's reputation were being severely damaged by Masiello's activity. The jury was not likely to find that he would allow so costly activities to continue merely for the illegal benefit of a subordinate. It is moreover obvious that Masiello's statements and actions would prove highly incriminating to Stickel. Stickel, as an innocent man, would not permit himself to be thus incriminated; or so the jury might rationally and naturally hold.

We return then to the first alternative, namely, that Stickel was ignorant of what Masiello was doing. But the contrary conclusion rests upon compelling inferences from the testimony, and there is no evidence whatsoever to challenge it. The view asserted by defendants presupposes a naiveté dazzling in its innocence. What, for example, was Stickel to think when employers deposited envelopes on the table at which he was sitting or handed envelopes to Masiello after receiving their contracts? What, for example, did Stickel, the Treasurer of the local union, think happened to the $1,200 in "retroactive pay" which Gilnack, with Stickel standing by, was ordered to pay his employees? Moreover, we must not make the mistake of isolating each incident and thus separately denigrating it. Actually all the evidence was a mosaic, each bit making its own contribution, and all building up to a compelling whole as first the court and second the jury should actually view it.[2] Thus we should

---

2. This general pattern is one of the features sharply distinguishing this case from United States v. Di Re, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210, heavily relied on by the defendants. The issue there was different, being the admissibility of evidence discovered by illegal arrest and search and seizure. The accused there was seated in the right front seat of an automobile where the driver passed counterfeit gasoline ration coupons to a government informer in the back seat, who

not overlook such matters as the patness with which the strikes were called by Stickel when Masiello's demands remained unsatisfied (as in the incidents testified to by Gilnack and Hillman), the completeness with which Stickel identified himself with Masiello and all Masiello's knowledge to the haulers such as Hillman, the revealing conversation with Hillman as to the transfer of Hillman drivers to the local union and the proper bonus therefor, and finally the thoroughly consistent request to International Vice President Hickey to let Masiello take the rap and allow him to go free. To rule as a matter of law that all this was not evidence for the jury of Stickel's guilty knowledge is to depart from the grounds of rational common sense. In the practical affairs of life we know that sophisticated executives of powerful groups are not so oblivious of money passing before their eyes. Nick v. United States, 8 Cir., 122 F.2d 660, 670, 138 A.L.R. 791, certiorari denied 314 U.S. 687, 62 S.Ct. 302, 86 L.Ed. 550, rehearing denied 314 U.S. 715, 62 S.Ct. 411, 86 L.Ed. 570, 316 U.S. 710, 62 S.Ct. 1103, 86 L.Ed. 1776.

Defendants complain that there was not yet more evidence of joint or integrated action. But, as disclosed by the testimony, these were shrewd individuals and a part of the success of their conspiracy was the careful compartmentalizing of the activities of each. Of course, the conspirators tried to keep their separate roles distinct, with Stickel speaking only in subtle generalities and exercising the powers that enforced compliance, while Masiello made the specific demands and collected the cash. But Masiello certainly made no effort to conceal his alliance with Stickel from the truckers. In fact he did just the opposite; he advertised it and did so continuously for its four-year duration. It passes credulity, of course, that Stickel alone never heard of it. It is obvious from the testimony of the haulers that they believed at the time of the shakedowns that the two men were working together. Knowing this and the many incidents where their activities so neatly dovetailed to the detriment of their victims, the idea that Stickel remained blissfully ignorant throughout is not to be credited. The jury by its speedy verdict in this long case showed its quick reaction to a common-sense result. Judges should not be more naive than others, including jurors. Notwithstanding the heavy burdens resting upon the prosecution because of the obvious difficulties of procuring testimony from participants and victims, and Stickel's shrewdness in avoiding many open mistakes, we find the case as disclosed quite ample to support conviction.

 In reaching the conclusion that the judge committed no error in sending the case to the jury, we have not cited or stressed the well-established rule here that the test for the judge to apply in determining what rational inferences of fact a jury may be permitted to draw from the testimony is the same in civil and criminal cases,[3]

---

later identified the driver only as the guilty party. Further differences are indicated by the following extract, 332 U.S. at page 593, 68 S.Ct. at page 228:

"An inference of participation in conspiracy does not seem to be sustained by the facts peculiar to this case. The argument that one who 'accompanies a criminal to a crime rendezvous' cannot be assumed to be a bystander, forceful enough in some circumstances, is farfetched when the meeting is not secretive or in a suspicious hide-out but in broad daylight, in plain sight of passers-by, in a public street of a large city, and where the alleged substantive crime is one which does not necessarily involve any act visibly criminal. If Di Re had witnessed the passing of papers from hand to hand, it would not follow that he knew they were ration coupons, and if he saw that they were ration coupons, it would not follow that he would know them to be counterfeit. Indeed it appeared at the trial to require an expert to establish that fact. Presumptions of guilt are not lightly to be indulged from mere meetings."

3. United States v. Valenti, 2 Cir., 134 F.2d 362, 364, and United States v. Castro, 2 Cir., 228 F.2d 807, may be taken as representative of a long line of cases.

because we view the prosecution's case as sufficiently strong to justify the result, whatever nuances of doctrines are applied. But since the rule has been misunderstood and not properly stated,[4] it seems proper to state again that if the jury is to be allowed its historic function as finders of fact—as now stressed by the Supreme Court in many cases, such as Schulz v. Pennsylvania R. Co., 350 U.S. 523, 76 S.Ct. 608— and if it is to be accredited its own proper responsibility as an important agency of law administration, it must also be permitted to make such inferences or deductions from the known data as are common sense under the circumstances. And such basic facts will not vary from civil to criminal cases; the mute testimony as to speed and position of an automobile as disclosed by the tire treads when the brakes are suddenly applied will not tell one story as to what actually happened in a criminal prosecution for manslaughter and another for damages for personal injury or wrongful death. To attempt some subtle distinction is to confuse this comparatively simple problem with the question of the proper charge to the jury and the differing standards there applicable in civil and criminal cases.[5] Both aspects—the judge's preliminary decision as to the facts and his later charge to the jury—having been carefully attended to below, the resulting just convictions must therefore be

Affirmed.

FRANK, Circuit Judge (concurring).

1. Masiello was admittedly guilty of the substantive crime. He was not, however, guilty of the sole crime for which he was indicted—i. e., conspiracy with Stickel—unless Stickel was guilty of conspiring with Masiello. I think that—except for one item—the evidence, although enough to support a judgment for the government, were it the plaintiff in a civil suit, does not suffice to support a criminal conviction.[1] But I agree that one item of testimony is so damning

---

4. Compare the concurring opinion in United States v. Castro, 2 Cir., 228 F. 2d 807, 808, which states that a man may be put to death even though the trial judge and the upper court "are sure that no reasonable men would believe that his guilt has been thus proved," i. e., "beyond a reasonable doubt"—and thus turns the rule inside out at the expense of its meaning.

5. The opposite or contrasting rule here prayed for is made none too clear; it seems to be that the judge in deciding what inferences of fact are rational and permissible from the testimony must somehow charge himself with the ultimate admonition given the jury of finding a crime proven beyond a reasonable doubt so that normally rational inferences, as in the example from the tire marks, become irrational in criminal cases. In this contention Dean Wigmore's common-sense comment on various attempts to embroider the reasonable doubt charge is pertinent: "In practice, these detailed amplifications of the doctrine have usually degenerated into a mere tool for counsel who desire to entrap an unwary judge into forgetfulness of some obscure precedent, or to save a cause for a new trial by quibbling, on appeal, over the verbal propriety of a form of words uttered or declined to be uttered by the judge. The effort to perpetuate and develop these elaborate unserviceable definitions is a useless one, and serves to-day chiefly to aid the purposes of the tactician. It should be abandoned:" 9 Wigmore on Evidence § 2497 (3d Ed. 1940). It seems even less constructive to force the judge to apply this wholly indeterminate yardstick to himself in deciding the preliminary and otherwise clear-cut question as to what inferences of fact are permissible on the evidence. Such a requirement would add nothing of either justice or trial convenience to the judicial process, but would promote confusion and yield at best only a vague, though undoubtedly vigorous, claim of error against the trial judge.

1. I cannot agree, for example, that it "passes credulity that Stickel alone never heard" of Masiello's shake-downs which Masiello accomplished by implied threats that otherwise Stickel would use his office to bring about strikes. Often a crooked agent successfully creates the false impression that his innocent principal is a party to or has authorized his misdeeds.

The evidence as to the incident when Stickel told Hillman that Masiello "knew everything that Stickel knew" turns out

that the jury could reasonably find Stickel, and therefore Masiello, guilty. beyond a reasonable doubt.[2]

2. Were it not for that particular testimony, I would dissent. For I disagree with my colleagues' statement that "the test for the judge to apply in determining what rational inferences of fact a jury may be permitted to draw from the testimony is the same in civil and criminal cases," and the statement in United States v. Feinberg, 2 Cir., 140 F.2d 592, 594, 154 A.L.R. 272, "that the standard of evidence necessary to send a case to the jury is the same in both civil and criminal cases". In a concurring opinion in United States v. Castro, 2 Cir., 228 F.2d 807, I stated my reasons for disagreeing with that thesis. I think it desirable, because of my colleagues' emphatic reiteration of that thesis in the instant case, to amplify (and, in one respect, modify) [2a] my comments in the Castro case.[2b]

3. It is a vaunted part of our legal tradition that the government's proof in a criminal case must be more persuasive than plaintiff's proof in a civil case, i. e., that while, in a civil case, to sustain a verdict, plaintiff's proof must be by a "preponderance of the evidence," in a criminal case the government as plaintiff must prove defendant's guilt "beyond a reasonable doubt." In a civil case, if the trial judge reasonably considers that the evidence most favorable to the plaintiff is such that a reasonable jury would not be persuaded to find that that evidence meets the "preponderance" standard, the trial judge should not allow the case to go to the jury but should direct a verdict for the defendant. Many courts, including several federal courts of appeal, have held

that the criminal standard requires that the judge direct a verdict for the accused if the judge reasonably thinks that the evidence for conviction is such that it might persuade a reasonable jury to find that it meets the "preponderance" test but does not meet the "beyond-a-reasonable-doubt" test, and that his failure to do so constitutes reversible error. Contrary to my colleagues' critical comment, those courts do not hold that the trial judge may decide whether the defendant is guilty beyond a reasonable doubt. Those courts do hold that the judge should direct a verdict for the accused, if the judge reasonably thinks that a reasonable jury could not find guilt proved beyond a reasonable doubt.

It has been suggested [3] (I think correctly) (a) that the civil standard—"by a preponderance"—means that the inferences from the testimony are such as to persuade that the occurrence of an essential fact was *more likely or probable* than its non-occurrence, and (b) that the criminal test—"beyond a reasonable doubt"—means that those inferences are such as to convince that the occurrence of an essential fact was *much more likely or probable* than its non-occurrence. Recently, Denning, J., an unusually able English judge, explained in an opinion the differences in burden of proof as follows: In a civil case, the evidence need only have a "reasonable degree of probability"; if "the evidence is such that the tribunal can say, 'We think it more probable than not,' the burden is discharged, but, if the probabilities are equal, it is not." In a criminal case, before a defendant is found guilty, "the evidence need not reach certainty but it must carry a high degree of probability. If the evidence against

---

on careful scrutiny, I think, to be quite capable of an entirely innocent interpretation.

It is no proof whatever of Stickel's participation in the shake-downs that the victimized haulers believed that "the two men were working together."

**2.** I refer to the testimony of Hickey as reported in my colleagues' opinion.

**2a.** See infra, footnote 8.

**2b.** As I said in Castro, I had previously acquiesced in that thesis.

**3.** Morgan, Some Problems of Evidence (1956) 84–85. For a somewhat similar statement, see McBaine, Burden of Proof: Degrees of Belief, 32 Calif.L. Rev. 242 (1944).

a man is so strong as to leave only a remote possibility in his favour which can be dismissed with the sentence, 'Of course it is possible, but not in the least probable,' the case is proved beyond a reasonable doubt, but nothing short of that will suffice." [4] This, I think, is what the Supreme Court meant when it said, in Holland v. United States, 348 U.S. 121, 126, 138, 75 S.Ct. 127, 130, 99 L.Ed. 150, "Unlike civil actions * * * the prosecution must always prove the criminal charge beyond a reasonable doubt. * * * The government must * * * prove every element of the offense beyond a reasonable doubt though not to a mathematical certainty."

Departing from its earlier view,[5] this Circuit, some years ago, contrived its own doctrine,[5a] which is as follows:

(a) The trial judge commits reversible error in a criminal case if, in his charge, he fails to tell the jury that, in order to find the accused guilty, they must conclude that his guilt has been proved beyond a reasonable doubt.

(b) But the trial judge commits no reversible error in failing to direct a verdict for the accused, or in not entering a judgment of acquittal (after a verdict adverse to the accused), if (1) he thinks that a reasonable jury could reasonably believe the evidence preponderates in the government's favor, even if (2) he reasonably feels sure that a reasonable jury could not believe that the evidence proves the accused guilty beyond a reasonable doubt. In such a case, he must let the case go to the jury—provided only he includes in his charge the statement that the jury must acquit unless it

believes the evidence proves the accused guilty beyond a reasonable doubt. If the jury then finds the accused guilty, the judge must enter a judgment of conviction, sending a man to jail or to his death—despite the fact that the judge feels certain that a reasonable jury could have had no more than a belief that accused's guilt had been proved by but a preponderance of the evidence.

To put it succinctly, even if the judge has no doubt that the jury cannot reasonably comply with his admonition that it must acquit unless it finds the accused guilty beyond a reasonable doubt—i. e., if he has no doubt that a reasonable jury could find guilt by no more than a preponderance of the evidence—nevertheless the judge must let the jury return a verdict, and if that verdict is adverse to the accused, the judge may not properly set aside the verdict and enter a judgment of acquittal.

Thus in this Circuit the reasonable-doubt standard has no significance whatever for the judge; its sole function is as a part of the instructions to the jury. So, in United States v. Castro, 2 Cir., 228 F.2d 807, 808, the majority opinion rejected the theory "that the accused is entitled to a protection greater than that the jury must be told that they must not have any fair doubt of the guilt of the accused," and added, "whether that is the doctrine in all the circuits we need not inquire, for it is the thoroughly established doctrine in this circuit that the only difference between a civil action and a criminal prosecution is in the instruction that must be given to the jury that they [the jury] must be convinced beyond all fair doubt."

---

4. Miller v. Minister of Pensions, 1947, 2 All Engl.L.Reports, 372.

5. See, e. g., Fraina v. United States, 2 Cir., 255 F. 28, 35.

5a. Even after the first enunciation of the "Second Circuit doctrine," this court sometimes reverted to its earlier view.

See, e. g., United States v. Wishnatzki, 2 Cir., 77 F.2d 357, 360; United States v. Silva, 2 Cir., 109 F.2d 531.

In other words, the present Second Circuit doctrine did not fully crystallize until fairly recently. It became fixed beginning in 1943 with United States v. Valenti, 2 Cir., 134 F.2d 362.

This "Second Circuit doctrine," [6] I think erroneous. It reduces the criminal standard to little more than a verbal ritual, a ceremonial set of words included in the judge's charge. This appears from this court's statement, in United States v. Valenti, 2 Cir., 134 F.2d 362, 364, that the "requirement of proof beyond a reasonable doubt is a direction to the jury" which "cannot be accorded a quantitative value other than as a general cautionary admonition."

If that be correct—if, for the judge, the beyond-a-reasonable-doubt test, can have no "quantitative value" greater than the "preponderance" test, and therefore he may not use the criminal test as either a pre-verdict or post-verdict check on the jury—then, if the jury finds the accused guilty, we may easily have a case where the judge must let the verdict stand although he is sure that guilt could not reasonably have been proved by anything more than a preponderance of the evidence. In short, according to this doctrine, a criminal conviction does not necessarily mean an adjudication of guilt beyond a reasonable doubt, but may well mean adjudication of guilt which can reasonably be by a preponderance only. One cannot too easily reconcile that doctrine with Mitchell v. Commissioner, 2 Cir., 89 F.2d 873. There this court held that acquittal of Mitchell in a criminal action, for wilful attempt to evade a tax, did not constitute *res judicata* in Mitchell's favor when later, in a civil action before the Board of Tax Appeals, he sought to avoid civil liability to the United States for failure to pay the very same tax with fraudulent intent to evade, a liability founded upon the very same evidence. This court gave as its reason for so holding that the acquittal was merely an adjudication that the proof was not sufficient to overcome all reasonable doubt of the guilt of the accused, and was therefore not at odds with proof by but a preponderance. See also Helvering v. Mitchell, 303 U.S. 391, 397, 403, 405–406, 58 S.Ct. 630, 82 L.Ed. 917.

This court, I think, has not heretofore attempted to explain the reason for its doctrine, except in United States v. Feinberg, 2 Cir., 140 F.2d 592, 594, 154 A.L. R. 272, where the court "refused to distinguish between the evidence which should satisfy reasonable men, and the evidence which should satisfy reasonable men beyond a reasonable doubt", because "in the long run the line between them is too thin for day to day use." The reasoning thus seems to be that the distinction is too tenuous to be understood and practically applied by anyone, either judges or juries.[6a] That reasoning is certainly more than implicit in my colleagues' statement in the instant case that the same evidence cannot "tell one story as to what happened in a criminal prosecution for manslaughter and another for damages for personal injury or wrongful death"—a statement which amounts to saying that the two standards are actually identical, albeit not worded identically. I shall assume, at any rate for the moment, that that is a correct interpretation of this court's reasoning. On that assumption, suppose this: A juror, who had earlier served in a civil case, asks the trial judge, after he has given his charge in a criminal case: "Is there a difference we must observe between a 'preponderance of the evidence' and 'beyond a reasonable doubt'?" Suppose the judge were to say, "Yes." Suppose the juror were then to ask, "If you were sitting as a juror, would you always, if the issues were the same, arrive at the same verdict, regardless of whether the case was civil or criminal?" If one of my two colleagues were the trial judge, then according to the Second Circuit doctrine, I think he would, in fairness, have to reply, "Yes. I am unable to see any intel-

---

6. The justification for that label will be found not only in the majority opinion, but in the headnote, to United States v. Castro, 2 Cir., 228 F.2d 807.

6a. I shall discuss infra, point 5, an alternative interpretation of this explanation.

ligible practical difference." The juror, if alert, would then inquire, "Well, if there is no difference, why, in a criminal case, do you give us a charge that varies from the charge in a civil case?" I leave it to my two colleagues to suggest the response.

4. When considering the import of this circuit's present doctrine, it is necessary, in order to keep in mind the functions of the judge and the jury respectively, to distinguish two different kinds of inferences:

(a) When, in a jury case, a witness testifies to the occurrence of a fact, the jury, if it belives him, may properly infer the occurrence of that fact from that testimony. Such an inference, based directly on testimony, is a *"testimonial inference"* (or a direct or primary inference). It rests entirely on the jury's belief in the credibility—reliability—of the testimony of some witness: A witness has directly testified to a fact which the jury, believing him, takes as a fact. Accordingly, such an inference is often (misleadingly) called "direct evidence." [6b]

(b) From one or more testimonial inferences, however, further inferences of the occurrence of other facts may be drawn, *i. e.,* inferences as to the existence or occurrence of facts concerning which no one has testified. Any such inference, for convenience, may be described as an "indirect" or *"derivative inference."* [7] Often it is labelled "circumstantial evidence" to distinguish it from "direct evidence."

A testimonial inference involves an evaluation of witnesses' credibility; but once a fact is inferred on the basis of a testimonial inference, then any fact derivately inferred from that fact *(i. e.,* any "circumstantial evidence") will in and of itself involve no evaluation of credibility.

[Because no one testifies to a fact thus derivatively inferred, it is sometimes called a "mute fact," or, as my colleagues put it, "mute evidence." It has been said that a fact thus derivatively inferred, *i. e.,* "circumstantial evidence," is therefore singularly reliable, more so that a fact to which some witness directly testified, because "circumstances cannot lie." That cannot be correct: The testimonial inference, from which such a fact is derivatively inferred, itself derives from testimony of a witness who may have lied or made a mistake in observation or memory or in his report at the trial of his memory. "It seems," said Wills, "to have been overlooked that circumstances * * * must be proved by human testimony; that although 'circumstances cannot lie,' the narrators of them may; that, like witnesses of other facts, they may be biased or mistaken * * *"[7a] "Granting that facts cannot lie, the witnesses who report them to the jury can and may," said Burill, Circumstantial Evidence (1868) 223.]

---

**6b.** "Direct evidence" is misleading. For the jurors do not see or hear the past events; they learn of those past events, at second hand, principally from the testimony of witnesses.

When a document is put in evidence, usually its authenticity is based on testimony. Even so called "real evidence" is impliedly vouched for by a witness. A witness' demeanor, sometimes called "demeanor evidence," affects the "testimonial inference" drawn from the witness' testimony.

**7.** For the nature of the important distinction between "testimonial" (or "direct evidence") and "derivative" infer-

ences (*i. e.* "circumstantial evidence"), see, e. g., Stephen, Introduction to The Indian Evidence Act (1872), 38, 41–46; 1 Wigmore, Evidence (3rd ed.) Section 25; American Tobacco Co. v. The Katingo Hadjipatera, 2 Cir., 194 F.2d 449, 451; N. L. R. B. v. Universal Camera Corp., 2 Cir., 190 F.2d 429, 432 · (concurring opinion); Wabash Corp. v. Ross Electric Corp., 2 Cir., 187 F.2d 577, 601–602 (dissenting opinion); Maine, Village Communities (4th ed. 1881) 317–318; Frank, Short of Sickness and Death, 26 N.Y.U.L.Rev. 545, 559–564 (1951).

**7a.** Wills, Circumstantial Evidence (Fifth Eng. ed. with American notes, 1905) 36.

In a criminal or a civil jury case, a federal trial judge, in determining whether to grant a new trial, may consider his own belief or disbelief in parts of the testimony and may thus draw his own testimonial inferences. But, in granting a new trial, the judge does not decide the case; he merely leaves the decision to another jury.

In determining, however, whether to direct a verdict for the defendant, in a civil or criminal case, the judge may not properly consider the credibility of any of the witnesses, i. e., he may not properly rely on his own testimonial inferences, but must leave the drawing of those inferences to the jury. And, after verdict, he must accept the jury's testimonial inferences when he determines whether in a civil case to enter a judgment n. o. v. or whether in a criminal case to enter a judgment for acquittal despite a guilty verdict.[8] That is, in making such determinations, the judge must accept as credible any testimony which will support the jury's verdict.

Although, in determining whether to direct a verdict or to enter judgment notwithstanding the verdict, the trial judge should never rely on his own testimonial inferences (since, for such purposes, the question of witness' credibility is for the jury), nevertheless, he should inquire whether any asserted derivative inference, essential to support a verdict, is irrational: When, in a civil case, an asserted derivative inference, constituting an essential component of a verdict for one party, is irrational, the judge should direct a verdict for the adversary, or, after verdict against that adversary, enter a judgment n. o. v. in his favor.[9] In a criminal case, if an asserted irrational derivative inference is essential to a verdict of guilt, the judge must direct a verdict for the accused or, after verdict of guilt, enter a judgment of acquittal.

---

**8.** In my concurring opinion in United States v. Castro, 2 Cir., 228 F. 807, 809–810, I intimated that in a criminal case tried to a jury a trial judge can sometimes properly direct a verdict on the basis of his own evaluation of the incredibility of government witnesses. That intimation was probably erroneous; cf. United States v. Renda, 2 Cir., 56 F.2d 601.

However, a distinction in this respect might conceivably be made between a criminal and a civil case in the federal courts: The Seventh Amendment, which relates solely to civil cases, contains the provision that "no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." The Sixth Amendment, which relates solely to criminal cases, contains no such provision. It is therefore perhaps possible to argue that, in a criminal case tried to a jury, the trial judge (or even an upper court on appeal) has a wider power of examining the facts, for the benefit of the defendant, and may therefore reject testimony which seems patently false. Cf. Shapiro, Criminal Appeal on the Facts and The Federal Judicial System, 34 Ill.L.Rev. (1939) 332.

**9.** In a federal civil case tried by a judge without a jury, the upper court must (except in unusual circumstances) accept the findings of the trial judge, insofar as they consist of testimonial inferences based on testimony of orally-testifying witnesses whose demeanor the trial judge observed. But the upper court may reject any of the trial judge's rational derivative inferences if other alternative rational derivative inferences are open. See, e. g., American Tobacco Co. v. The Katingo Hadjipatera, 2 Cir., 194 F.2d 449, 451; E. F. Drew & Co. v. Reinhard, 2 Cir., 170 F.2d 679, 684; In re Kellett Aircraft Corp., 3 Cir., 186 F.2d 197, 200; Wabash Corp. v. Ross Electric Corp., 2 Cir., 187 F.2d 577, 601–603 (dissenting opinion); Orvis v. Higgins, 2 Cir., 180 F.2d 537; cf. Gindorff v. Prince, 2 Cir., 189 F.2d 897.

Whether the same is true when an upper court reviews the findings of a trial judge sitting in a criminal case without a jury, has not yet been considered, so far as I know. I see no good reason for a difference.

The rule is different when an upper federal court reviews the rational derivative inferences of a federal administrative agency. See N. L. R. B. v. Universal Camera Corp., 2 Cir., 190 F.2d 429, 432 (concurring opinion); N. L. R. B. v. Dinion Coil Co., 2 Cir., 201 F.2d 484, 490; cf. F. C. C. v. Allentown Broadcasting Corp., 349 U.S. 358, 364, 75 S.Ct. 855, 99 L.Ed. 1147.

In making such determinations, a federal trial judge does not "weigh the evidence" in the sense that he considers questions of credibility. However, he must determine whether the permissible testimonial inferences plus the rational derivative inferences (*i. e.*, the "direct" plus the "circumstantial" evidence) are sufficient to make out a case for the jury. In so doing, he does not take over the jury's function.[10]

5. Up to this point, I think all the federal courts agree (although the phraseology varies). The Second Circuit however, disagrees with others concerning the rule applicable, in a criminal as distinguished from a civil jury case, in the following situation:

(a) There is testimony justifying some testimonial inferences. (b) A particular derivative inference (*i. e.*, "circumstantial evidence"), drawn from those testimonial inferences, is essential to a verdict for one party. (c) That derivative inference is rational, *i. e.*, on the basis of that inference, the occurrence of an essential fact may be inferred rationally, although no one has testified to that fact. (d) The support in the testimonial inferences ("direct evidence") for that derivative inference (*i. e.*, for that "circumstantial evidence") is such that the occurrence of that inferred fact is *more probable* than its non-occurrence, *but is not much more probable*. In a civil jury case of that sort, the judge should not direct a verdict—and he may not properly, after verdict, enter a judgment n. o. v.—at variance with such a derivative inference *(i. e.*, with the "circumstantial evidence").

Does the same rule apply in a criminal case? Must the trial judge, in such a case, apply the same test to such a derivative inference ("circumstantial evidence") as in a civil case? Is the difference between the two standards—as to the degree of probability of a derivatively inferred fact ("circumstantial evidence")—one which the judge must ignore? The Second Circuit now says Yes. Many other courts say, No. I think the latter answer correct.

I assumed, supra, that this court's explanation of the reason for its doctrine is that no intelligible, practical, difference exists between the two standards.[11] Perhaps, however, my colleagues would say that what they mean is that the difference exists yet that it is too tenuous for judges, but not for juries, to understand it. Such an explanation I find difficult to comprehend: If jurors can differentiate the two tests, cannot judges? Federal judges in other circuits apparently have thought so, for they have found it possible to apply the criminal test when reversing criminal convictions.[12] Are the district and circuit judges in the Second Circuit singularly obtuse?

As I said in the Castro case, supra [228 F.2d 809] the Supreme Court does not deem judges unable "to engage in such or similar line drawing. It requires a judge to perform that feat when he sits in a criminal case without a jury. It requires a judge to make a not unlike distinction in a denaturalization proceeding (which is judge-tried); his decision for the government in such a case will be reversed if it rests on evidence measuring up merely to the standard of a preponderance of the evidence.[13] Con-

---

10. Of course, if a federal trial judge does direct a verdict for the defendant in a criminal case and enters judgment accordingly, his judgment is not appealable. He can thus "abuse" his power without possibility of reversal.

11. United States v. Feinberg, 2 Cir., 140 F.2d 592, 594, 154 A.L.R. 272.

12. See, e. g., Chicco v. United States, 4 Cir., 284 F. 434; Parnell v. United States, 10 Cir., 64 F.2d 324, 329; Cooper v. United States, 94 U.S.App.D.C. 343, 218 F.2d 39; Friedus v. United States, 96 U.S.App.D.C. 133, 223 F.2d 598; Rodriguez v. United States, 5 Cir., 232 F.2d 819, 820–821.

13. Baumgartner v. United States, 322 U.S. 665, 64 S.Ct. 1240, 88 L.Ed. 1525; Schneiderman v. United States, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796.

sider also a judge-tried suit * * * to establish a lost instrument; in such and several other kinds of cases, the trial judge's decision will be reversed unless the proof was 'clear and convincing' (or the like).[14] In a patent case, the judge's decision as to prior use of the patented device must be reversed unless the proof leaves no reasonable doubt." [15]

To support their position, my colleagues mention, as illustrative, a case where "the evidence" as to "speed and position of an automobile" is "disclosed by the treads when the brakes are suddenly applied." My colleagues, as above noted, say that such evidence cannot sensibly "tell one story as to what actually happened in a criminal prosecution for manslaughter and another for damages for personal injury or wrongful death." Perhaps not, in such a case: (a) If there is testimony as to the tire marks—i. e., testimony that a photograph of those marks was competently and accurately made at or near the time when two cars collided or a car ran into a man—then the jury's testimonial inference of the existence of those marks cannot be questioned by the judge.[16] (b) With such a testimonial inference, the difference between a rational derivative inference in a civil and a criminal case—the difference in the degree of probability—might be impalpable for both the judge and the jury (except in most extraordinary circumstances, hard to imagine). But in the instances where other federal appellate courts have made a distinction between civil and criminal cases, there was a pal-

pable difference in the degree of probability.[17]

My colleagues say [18] that, under the rule to which those courts adhere, "normally rational inferences * * * become irrational inferences in criminal cases." Not at all. What those courts hold, as I analyze their opinions, is that a crucial fact rationally inferred by a derivative inference (i. e., a crucial fact to which no one has testified) (1) suffices to sustain a verdict in a civil case if, on the basis of that inference, the occurrence of that fact is more probable than its non-occurrence, but (2) does not suffice to sustain a verdict in a criminal case unless the occurrence of that crucial derivatively inferred fact is much more probable than its non-occurrence.

To rephrase the rule: In a civil, as well as in a criminal action, the judge, on a defendant's motion for a directed verdict, must ascertain whether there is "substantial" evidence to support a plaintiff's verdict; in reaching his conclusion, he must assume the credibility of the witnesses whose testimony favors the plaintiff, and he must then decide whether the support in the evidence for any derivative inference ("circumstantial evidence"), essential to a verdict for plaintiff, is "substantial"; but, in a criminal case, because of the higher proof-burden, the word "substantial" has a meaning different from its meaning in a civil case.[19] Wherefore it will not do to cite, as a prop for the Second Circuit doctrine, the following from Pierce v. United States, 252 U.S. 239,

14. This court so held in Cullen v. Chappell, 2 Cir., 116 F.2d 1017.

15. Deering v. Winona Harvester Works, 155 U.S. 286, 301, 15 S.Ct. 118, 39 L.Ed. 153.

16. Except, as noted above, in granting a new trial (as distinguished from granting a directed verdict or a judgment of acquittal or n. o. v.).

17. As I said in the Castro case, supra, I grant that the application of neither standard yields certainty, that no scales

exist for "weighing evidence," and that talk of "weighing" in this context relies on what may be a most misleading metaphor. See Larson v. Jo Ann Cab Corp., 2 Cir., 209 F.2d 929.

18. See their footnote 5.

19. Cf. United States v. United States Gypsum Co., D.C., 51 F.Supp. 613, 629, 632, cited with approval in Curley v. United States, 81 U.S.App.D.C. 389, 160 F.2d 229, 233, and Cooper v. United States, 94 U.S.App.D.C. 343, 218 F.2d 39.

251–252, 40 S.Ct. 205, 210, 64 L.Ed. 542: "There being substantial evidence in support of the charges, the court would have erred if it had peremptorily directed an acquittal upon any of the counts. The question whether the effect of the evidence was such as to overcome any reasonable doubt of guilt was for the jury, not the court, to decide." It should be noted that the Court found there was "substantial evidence." Moreover, the Court had previously said, 252 U.S. at page 250, 40 S.Ct. at page 202, that the evidence was "abundant." The Court did not at all suggest the absence of a difference in the meaning of "substantial" evidence in a criminal as distinguished from a civil case.

Consider, for instance, Parnell v. United States, 10 Cir., 64 F.2d 324, 329 where on rehearing the court held that the trial judge should have directed a verdict in favor of one of the accused, Hays, charged with criminal conspiracy. The court said the basic question was whether Hays was a partner of the co-defendant, Parnell, or merely an employee. It concluded that, since the evidence was consistent with the theory that he was an employee, it was error not to direct a verdict for him. In reaching this conclusion, the Court summarized the testimony as follows: "Hays helped construct and operate the still on the Tidwell Farm. With one Slade, he became a surety on the bail bond of Jake Strieber, who was charged with the violation of the prohibitory liquor laws; he, with Parnell and one Muse, was also a surety on the bond of Jake Bock who was interested in the Tidwell still, and was active in making bond for a negro named Cuba, who had been employed at the still, both charged with a violation of the liquor laws." Suppose this had been a civil suit against Hays in which the plaintiff's case turned on whether Hays was a partner in this enterprise;

I submit that the court would have held a derivative inference drawn from the same testimony would have been substantial enough to support a verdict for plaintiff.[20]

My colleagues surprisingly cite, in support of their position, Schulz v. Pennsylvania R. Co., 350 U.S. 523, 76 S.Ct. 608, 610, a civil negligence action for wrongful death under F. E. L. A. There the testimony, favorable to plaintiff, justified testimonial inferences reported by the Supreme Court as follows:

On Christmas Day 1949, at about 5:15 P.M., the deceased, Schulz, reported for work on his job at Pier H, Jersey City, New Jersey, and was assigned to work on four tugboats docked side by side there. He went immediately to check the boats without waiting to change from his street to his working clothes. Returning to the pier alongside the tugs about seven o'clock, Schulz reported that he had finished his checking and was now going back to the boats to change to his work clothes and proceed with his other duties there. He was last seen alive walking in the direction of the nearest tug. At 1:25 A.M. a supervisor found Schulz was not on the boats. His street clothes were hanging in the upper engine room where the tug attendants usually changed clothes. His lunch package was also there. Three of the tugs were at all times wholly unlighted and dark; one was partially illuminated by spotlights from the pier. The night was cold—10 above zero—and there was some ice on the tugs. Because the company did not have enough workers that night properly to perform the duties that were required, Schulz had to try to take care of all four tugs by himself. To do this he had to step from one boat to another in the dark except for such limited illumination as he could obtain from a flashlight. Several weeks after

---

20. For other instances of reversals of criminal convictions where I think it clear the results would have been otherwise had the suits been civil, see, e. g., United States v. Litberg, 7 Cir., 175 F.2d 20; Cooper v. United States, 94 U.S.App.D.

C. 343, 218 F.2d 39; Rodriguez v. United States, 5 Cir., 232 F.2d 819. See also United States v. Silva, 2 Cir., 109 F.2d 531, decided (as previously noted) before the Second Circuit doctrine had fully crystallized.

Schulz disappeared from the boats his body was found in the water near an adjacent pier. He was clothed in nothing but shorts and socks. A flashlight was in his hand. He had drowned. He was not under the influence of alcohol when he came to the boat, he did not commit suicide, there was no foul play, and he met his death by accident. He was a capable and experienced workman who had been employed by the defendant for several years. The trial judge directed a verdict for the defendant. We affirmed—2 Cir., 222 F.2d 540—on the ground that it could not be reasonably inferred from the testimony that Schulz's death "was proximately caused by any default on the part of the defendant." The Supreme Court reversed, holding that the jury could have made reasonable derivative inferences sufficient to sustain a verdict for plaintiff. The Court said: "Fair-minded men could certainly find from the foregoing facts that defendant was negligent in requiring Schulz to work on these dark, icy and undermanned boats. And reasonable men could also find from the discovery of Schulz's half-robed body with a flashlight gripped in his hand that he slipped from an unlighted tug as he groped about in the darkness attempting to perform his duties. But the courts below took this case from the jury because of a possibility that Schulz might have fallen on a particular spot where there happened to be no ice, or that he might have fallen from one boat that was partially illuminated by shore lights. Doubtless the jury could have so found (had the court allowed it to perform its function) but it would not have been compelled to draw such inferences. For 'The very essence of its function is to select from among conflicting inferences' ". My colleagues, in effect, conclude that, if the defendant in the Schulz case were indicted for manslaughter, and if at the trial the same evidence were introduced by the prosecutor, the Supreme Court would hold that the same derivative inference would support the defendant's conviction. I most seriously doubt that conclusion. I would entertain the same doubt if the plaintiff had been the government prosecuting the defendant for a crime in Tennant v. Peoria & P. U. Ry., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520, or in Lavendar v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916, or in Cahill v. New York, N. H. & H. R. Co., 350 U.S. 898, 76 S.Ct. 180, reversing 2 Cir., 224 F.2d 637. For as Wigmore puts it (Evidence, Section 2498): "In civil cases the extreme caution and the unusual positiveness of persuasion required in criminal cases do not obtain."

The reason for requiring a higher standard of probability in a criminal case is, of course, that a criminal conviction entails far more serious consequences than a civil judgment. If the judges abandon responsibility for determining whether reasonable juries could find that derivative inferences ("circumstantial evidence") meet that higher standard, I think they cut the heart out of our oft-repeated boast that, in this land, no man can be jailed or put to death by the government unless proof of his guilt has been established beyond a reasonable doubt.[21]

21. I repeat what I said in United States v. Castro, 2 Cir., 228 F.2d 807, 810: "Since a criminal action involves a man's life or liberty, we ought not, in such an action, accord much sanctity to stare decisis by adhering to a precedent favorable to the prosecutor, if we now consider it markedly unreasonable, undesirable, or unjust. See discussion and citations in United States v. Scully, 2 Cir., 225 F.2d 113, 118 (concurring opinion). For that reason, while in civil suits I feel obliged to follow recent decisions of this court with which I disagree, see, e. g., my concurring opinion in Rieser v. Baltimore & O. R. Co., 2 Cir., 224 F.2d 198, 205, I feel free to dissent from any of our decisions based on established rules adverse to one accused of crime, when I think those rules unjust."